NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0015n.06
Filed: January 8, 2007

No. 04-5777

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Yvonne N. **Stringfield**, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Middle |
| Mary Ella **Graham**, individually and in her capacity as | ) | District of Tennessee |
| Dean in the School of Nursing for the Tennessee State | ) | |
| University; Tennessee State University; and Tennessee | ) | |
| Board of Regents, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before:     **BOGGS**, Chief Judge; **MOORE** and **COOK**, Circuit Judges.

        **PER CURIAM**.

        Plaintiff Yvonne N. Stringfield, who held positions at Tennessee State University ("TSU")

as a tenured faculty professor and director of the baccalaureate program in nursing, sued TSU, the

Tennessee Board of Regents ("TBR"), and Mary Ella Graham, individually and in Graham's official

capacity as dean of the School of Nursing, under 42 U.S.C. § 1983, claiming that her property and

liberty rights had been deprived without due process when she was removed without notice or

hearing from her administrative position (but retained as a tenured professor). The district court

dismissed her suit, based on sovereign immunity and qualified immunity. Stringfield appeals. For

the reasons below, we reverse in part, affirm in part, and remand for proceedings consistent with this opinion.

## I

Beginning in 1996, Stringfield was employed at TSU as the director of the baccalaureate nursing program and as a member of the faculty. Her "notice of appointment and agreement of employment" from TSU, which she signed in July 1996, confirmed her "appointment to a position approved by the Tennessee Board of Regents as Director in the Baccalaureate Nursing Program with the salary of ___ per year, subject to the terms and conditions hereinafter set forth . . . ." The agreement stated that the appointment was made subject to the laws of Tennessee and the requirements and policies of the TBR and TSU. It noted that Stringfield, as was the case with all new employees, could be terminated without prior notice during a probationary period of six months but that thereafter the agreement could be terminated only upon thirty days' notice. *Ibid*. Under a section beginning "[t]he following special conditions shall govern this appointment," the agreement stated, *inter alia*: "[t]enure track Appointment with three (3) year probationary credit."

Stringfield eventually became a tenured member of the faculty.[1] Mary Ella Graham, who became dean of TSU's School of Nursing in 2002, evaluated Stringfield (in the latter's capacity as director of the baccalaureate nursing program) in June 2002 and June 2003, generally giving Stringfield high marks on both occasions. Graham did note, however, that Stringfield should work

---

[1]In her initial brief at p. 4, she states that she was granted tenure in 1999 and became a full professor the next year, although those dates are not specified in her complaint or in the materials attached to it before the district court.

to make necessary changes in the courses to ensure student success on the "N-CLEX RN exam."

By letter dated September 23, 2003, Graham informed Stringfield that she was "releasing" Stringfield from her "administrative position of BSN Program Director effective September 24, 2003." The letter stated that "[i]t has become apparent to me, this semester, that you are unable to provide the leadership that is necessary to move the BSN Program forward including the implementation of strategies that ensure that graduates from your program will be able to achieve the minimum N-CLEX RN pass rate of 85%." The three-page letter added that that conclusion was based on a series of occurrences since the beginning of the semester, which Graham listed. The letter concluded by stating that "[y]ou will return to a faculty position, and continue teaching Nurs 250 this semester. Additional activities consistent with the faculty role may be assigned to you this semester." Stringfield apparently met with Graham on the morning of September 24, 2003.

On December 9, 2003, Stringfield sent a nine-page letter to Graham, with copies to the president of the university and another administrator, in which she responded to and challenged Graham's stated reasons for finding that she was not providing adequate leadership in her role as director of the baccalaureate nursing program. Stringfield stated in the letter that if Graham had talked with Stringfield Graham would have been made aware of the information in the letter. Stringfield added that she believed her removal was "unfair and unjust."

Stringfield filed suit in the United States District Court for the Middle District of Tennessee on March 3, 2004. In her complaint, she named as defendants Graham–in her individual and official capacities–and TSU and the TBR, "for a cause seeking compensation for the extent to which the contract of Dr. Stringfield with TSU has been violated together with the deprivation of her rights to

constitutional due process." The complaint stated that Stringfield's "employment contract, together with the defined process to which she was entitled before any action demoting her, created in her a property right she could not be denied without due process of the law. Dr. Stringfield submits she could not be terminated or demoted without either notice or good cause and Dr. Stringfield was entitled to have due process attend the Defendants' decision."

Stringfield also alleged a deprivation of a liberty interest; she claimed that she had a liberty interest in preserving her good name, reputation, honor, and integrity, and that Graham's charges in the September 23, 2003 letter called her reputation into question "in a constitutional sense." The defendants, she alleged, had foreclosed other employment opportunities for her by maintaining a false personnel folder that would likely be given to other prospective employers. She claimed that the contents of Graham's September 23, 2003 letter were false for the reasons stated in her December letter.

Stringfield sought, *inter alia*, reinstatement, back pay for the director's position, front pay if she is not reinstated, punitive damages, and the purging from her file of the false and erroneous information.

Stringfield attached to her complaint her employment agreement from 1996, the TSU Personnel Handbook, Graham's September letter to Stringfield, Graham's performance evaluations of Stringfield, and Stringfield's December 2003 letter to Graham. The relevant aspects of each of the attachments is discussed above, with the exception of the TSU Personnel Handbook. The Handbook stated that it was intended to be a general reference source and did not create a contract of employment. It noted, in outlining the types of employees at TSU, that academic (faculty)

personnel consisted of employees who engaged in teaching, research, and other academic activities and have academic rank, and are appointed by the president, and that administrative and professional staff (exempt) were those who performed professional, managerial, and/or supervisory duties, and that with the exception of those assigned the highest responsibilities and holding appointments approved by the TBR, were appointed by the president. In listing the president's duties, it noted that the president had authority to remove personnel subject to TBR policies and procedures and to prior approval or confirmation of the TBR.

The Handbook stated that TSU could terminate an employee agreement without cause at any time with thirty-day notice for professional and administrative staff. The Handbook also contained a long section on disciplinary policy and procedures. That section stated that "[n]ormally, the reason for taking disciplinary action is to correct an individual's misconduct and to warn that repetition of similar behavior can result in discharge," and that normally, "no disciplinary action involving demotion, suspension, or dismissal is to be taken against any regular, full-time employee until such disciplinary action has been discussed" with Human Resources "or a designated representative," and that "dismissal requires the concurrence of the appropriate Vice President and the President."

The Handbook listed "examples of circumstances and instance of misconduct requiring disciplinary action." In a category of circumstances requiring immediate discharge were, e.g., theft, fighting, and gross insubordination. It then listed a category of cases of misconduct "that usually do not warrant immediate discharge but will result in disciplinary action. Usually this disciplinary action will be either a noted oral warning or a written reprimand." The non-exclusive list of examples of such misconduct included improper use of equipment or failure to report an accident.

In response to Stringfield's complaint, the defendants filed both an answer and a motion to dismiss, apparently on the same day, April 26, 2004. In the answer, which did not reference sovereign or qualified immunity, the defendants denied that they had deprived Stringfield of any property right or liberty interest or of any rights to constitutional due process. They admitted that pg. 22 of the Personnel Handbook, which stated that TSU could terminate an employment agreement without cause any time within thirty days' notice for professional and administrative staff, "relates to the terms of Employment/Employment Agreement." They averred that Stringfield was not terminated from her tenured faculty position but was reassigned to a faculty position. *Ibid*. They also admitted that suspension or dismissal is to be discussed with Human Resources. They denied that Stringfield's action was "a mere 'inattention or neglect of minor significance,'" and while admitting that she did not receive a warning or reprimand, stated that she was not entitled to one. They denied that she "was terminated."

In their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the defendants asserted that the court did not have subject matter jurisdiction over Stringfield's claims for damages or injunctive relief against TSU, TBR, or Graham in her official capacity, that the claims against Graham in her individual capacity should be dismissed because of qualified immunity, and that TSU, TBR, and Graham in her official capacity were not liable for the damages sought by Stringfield.

On June 8, 2004, the district court entered an order granting the defendants' motion in its entirety. In its memorandum, the district court noted that Stringfield had failed to respond to the motion to dismiss, but that the court found it ripe for review. After stating the standard of review

for a 12(b)(1) motion, the court stated that "[w]hen a party files a motion to dismiss under 12(b)(6), the district court must treat the motion as one for summary judgment if either party submits additional materials 'outside the pleadings.'" It then recited, briefly, the standard of review for summary judgment.

The court proceeded to find that sovereign immunity operated to bar all of Stringfield's claims–for monetary and injunctive relief–against TSU, TBR, and Graham in her official capacity. With respect to qualified immunity regarding Graham in her individual capacity, the court stated that Stringfield "had not satisfied the requirement of showing a particularized right such that Dean Graham would have been aware that she was violating Plaintiff's rights in demoting her without notice and a hearing." It concluded that "[g]iven Plaintiff's failure to plead with more particularity, and Plaintiff's subsequent failure to oppose Defendants' Motion to Dismiss, the Court is left with little choice but to find that . . . Graham is immune from Plaintiff's suit."

Stringfield challenges what she characterizes as the district court's conversion of the defendants' motion to dismiss to a motion for summary judgment without notice and without an opportunity for Stringfield to submit additional materials; the district court's dismissal of her claim for injunctive relief against Graham in her official capacity on sovereign immunity grounds; and the dismissal of her claims against Graham in her individual capacity on qualified immunity grounds.

## II

This court reviews *de novo* the district court's application of the law to the facts in ruling on a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). This court reviews *de novo* a district court's dismissal of a

complaint pursuant to Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint must allege facts which, if proved, would entitle the claimant to relief. The court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Arrow v. Fed. Reserve Bank of St. Louis*, 358 F.3d 392, 394 (6th Cir. 2004).

## III

## A

Stringfield asserts that the district court erred in converting the defendants' motion to dismiss into a motion for summary judgment, and entering summary judgment for the defendants, without giving notice of the conversion or holding a hearing. However, the district court did not in fact convert the motion to dismiss into a motion for summary judgment. Thus, Stringfield's argument is unavailing.

In its memorandum opinion, the district court briefly noted the provision in Federal Rule of Civil Procedure 12(b) regarding conversion of a Rule 12(b)(6) motion to a Rule 56 motion for summary judgment.[2] The district court's citation of the conversion provision appears to have been extraneous, and quite possibly accidental. While the district court did reference certain documents,

---

[2]That provision states that a 12(b)(6) motion shall be treated as a summary judgment motion if "matters outside the pleading are presented to and not excluded by the court," and mandates that in such event, parties must be "given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

such as Stringfield's contract and the September 23, 2003, letter from Graham, those documents had

been attached to and cited by Stringfield's complaint, and so are considered parts thereof under

Federal Rule of Civil Procedure 10(c). Aside from the reference to the conversion provision of Rule

12(b), nothing in the memorandum opinion notes or applies a summary judgment standard. To the

contrary, it concludes by granting the "Motion to Dismiss." The district court granted the

defendants' motion to dismiss on the grounds of sovereign and qualified immunity. As discussed

below, the district court erred in doing so in two respects; but it did not convert the motion to dismiss

into a motion for summary judgment, improperly or otherwise.

**B**

Stringfield argues that the district court erroneously dismissed, on sovereign immunity

grounds, her claims for injunctive relief–e.g., reinstatement and the purging of her file–against

Graham in Graham's official capacity. Stringfellow is correct, and the State of Tennessee conceded

as much at oral argument. As this court, sitting en banc, stated in a recent tour of sovereign

immunity law, the states' federal-court immunity "does not apply if the lawsuit is filed against a state

official for purely injunctive relief enjoining the official from violating federal law." *Ernst v. Rising*,

427 F.3d 351, 358-59 (6th Cir. 2005) (en banc) (citing *Ex parte Young*, 209 U.S. 123, 155-56

(1908)). "[W]hen state officials are sued solely for prospective injunctive relief, sovereign immunity

does not apply even if the injunctive relief may affect the state treasury." *Id*. at 365 (citing *Edelman

v. Jordan*, 415 U.S. 651, 667 (1974)). *See also id.* at 367-69. "The Eleventh Amendment does not

bar § 1983 actions brought against state officials in their official capacities seeking prospective injunctive relief." *Williams v. Commonwealth of Kentucky*, 24 F.3d 1526, 1544 (6th Cir. 1994).

We reverse the district court's dismissal of Stringfield's claims for prospective injunctive relief against Graham in Graham's official capacity on sovereign immunity grounds, and remand for further proceedings.

## C

Stringfield argues that the district court erred in dismissing her claims against Graham in Graham's individual capacity on qualified immunity grounds. "In civil suits for money damages, government officials are entitled to qualified immunity for discretionary acts that do 'not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.'" *Goad v. Mitchell*, 297 F.3d 497, 501 (6th Cir. 2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court ruling on qualified immunity must first consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Then, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry . . . must be undertaken in light of the specific context of the case . . . ." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In determining whether a right was clearly established, the "relevant, dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. Generally, in inquiring whether a constitutional right is clearly

established, this court looks first to decisions of the Supreme Court, then to its own decisions and

those of other courts within this circuit, and finally to decisions of other circuits. *Williams*, 24 F.3d

at 1533.

**1**

Stringfield asserts that Graham violated her clearly established procedural due process right

to notice and an opportunity to be heard before she was removed from her position as director of the

baccalaureate nursing program, in which she says she had a property interest. She points primarily

to *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), in which the Court held that public

employees in whom an Ohio statute created a property right in continued employment – under the

statute the employees were classified as civil servants, to be discharged only for cause – required

"some form of pretermination hearing" before being discharged. *Id*. at 538-42.

The *Loudermill* Court noted that property interests are not created by the Constitution, but

rather "'are created and their dimensions are defined by existing rules or understandings that stem

from an independent source such as state law . . . .'" *Id*. at 538 (quoting *Bd. of Regents v. Roth*, 408

U.S. 564, 577 (1972)). Yet the Due Process clause "provides that certain substantive rights–life,

liberty, and property–cannot be deprived except pursuant to *constitutionally adequate* procedures."

*Id*. at 541 (emphasis added). The Court stated that the "root requirement" of the Due Process Clause

was "that an individual be given an opportunity for a hearing *before* he is deprived of any significant

property interest." *Id*. at 542 (internal quotation marks and citation omitted) (emphasis in original).

The Court concluded that "[t]he tenured public employee is entitled to oral or written notice of the

charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 546. Stringfield argues that she was afforded no notice or opportunity to respond to Graham's removal of her from the position of the directorship, and that *Loudermill* and ensuing cases show that Graham's treatment of her was a violation of clearly established constitutional rights.

Defendants counter that Stringfield did not have a property interest protected by the Due Process Clause in her administrative position as director of the baccalaureate nursing program.

*Bd. of Regents v. Roth* sets out the basic principles determining whether a deprivation of property rights in violation of constitutional due process has occurred. The Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. . . . Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577. *See also Perry v. Sindermann*, 408 U.S. 593, 601 (1972). In *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1271 (6th Cir. 1988), this court "acknowledg[ed] that constitutionally protected property interests can be created by either explicit or implied contractual terms." The inquiry into whether one has a property interest is to be made by inquiring into state law. *Gregory v. Hunt*, 24 F.3d 781, 785 (6th Cir. 1994) (citing *Bishop v. Wood*, 426 U.S. 341, 344 (1976)).

The parties agree that because she was a tenured member of the faculty, Stringfield had a property interest at least in her faculty position. Indeed, Tennessee statutes specifically provide for the processes by which a faculty member (at, e.g., TSU) receives tenure, which must be approved by the TBR, and which may be terminated only be for cause. *See* TENN. CODE ANN. §§ 49-8-301, 49-8-302, 49-8-303, 49-8-801. If Stringfield had been terminated from her tenured faculty position in the manner she was removed from her administrative position, the constitutional violation would be plain.[3]

Defendants argue, however, that Stringfield "was never deprived of her position as a tenured faculty member"; she was removed, rather, from her administrative position as director, in which they assert she had no property interest.

Stringfield asserts that her tenure status, and thus the due process protections that tenure afforded, applied both to her position as a faculty member and as an administrator. She points first to the terms of the 1996 contract, and to the part that states: "[t]he following special conditions shall govern this appointment: Tenure track Appointment with three (3) year probationary credit." That part does not specify whether it means that Stringfield was to have a tenure-track faculty job distinct from the administrative position. She also points to the fact that the contract specified that her position was approved by the TBR, which is the body that must approve faculty tenure. TENN. CODE ANN. § 49-8-301.

---

[3]In her briefs, Stringfield asserts that she was in fact "forced out" of her faculty position after she was released from her directorship. There is no reference to that in any of her submissions to the district court, however.

Stringfield then cites *Davis v. Barr*, 373 F. Supp. 740, 746 (E.D. Tenn. 1973), for the proposition that even if the contract had not given her tenure in her administrative position, she held a property interest in the directorship through her status as a tenured faculty member. *Davis* involved a due process claim by a tenured high school teacher, who also served as a football coach, that his termination from his position as coach violated his due process right to notice and a hearing. The court found that he had been hired to fill the "dual position" and that he was paid less as just a teacher than he was as teacher and coach. The court found that "the plaintiff had a legitimate claim to entitlement as a teacher and coach without summary discharge from his coaching duties," and thus that his rights to procedural due process had been violated by the defendants' "summarily demoting him without a hearing." *Id*. at 742-46.

Prior cases have held that tenured university professors did not have a constitutionally protected property interest in administrative posts. In *Garvie v. Jackson*, 845 F.2d 647 (6th Cir. 1988), we upheld summary judgment for the defendants on qualified immunity grounds where the plaintiff, who was both a tenured professor at the University of Tennessee and the head of a department, asserted that his removal from his position as head of the department without a hearing violated his due process rights. In that case, the plaintiff had been offered the appointment with the understanding that he would be recommended for tenure as a professor but that the administrative post carried no tenure. 845 F.2d at 648-49. The *Garvie* court, based on dicta in *Blackwell v. Quarterly County Court of Shelby County*, 622 S.W.2d 535, 539 (Tenn. 1981), stated that "[o]rdinarily, under Tennessee law a public employee has only those rights to continued employment

that are granted by a tenure system." The court noted that the University of Tennessee Faculty Handbook emphasized that department head positions, like all other administrative positions, carried no tenure. Furthermore, the correspondence relating to Garvie's appointment did not support a finding that a department head position could be terminated only for cause, stating clearly that department heads served at the pleasure of the chancellor. *Id.* at 651. The court found that reasonable administrators could have found that Garvie was removable, and thus had no property interest in the department head position, and that the defendants were therefore entitled to qualified immunity. *Id.* at 652.

In *Bullock v. Bd. of Regents*, 1989 WL 140167 (6th Cir. 1989) (unpublished), Bullock alleged a due process violation when she was terminated from her administrative position as director of a center at TSU. Bullock was hired initially as an assistant professor, then received tenure, and subsequently was made director of the center. She was removed without notice from the administrative position, as a consequence of which she suffered a pay cut. *Id.* at *1-2. On summary judgment, the district court concluded that she had no property interest in the directorship of the center. We held that "[t]he record clearly shows that Dr. Bullock had tenure only in her capacity as an academic professor and not as director of the Center. . . ." *Id.* at *3. TBR policy provided that "no faculty member would be eligible for tenure in an administrative position, but could hold tenure only in a faculty position." *Id.* at *1. Bullock pointed to a TSU *Handbook for Non-Instructional Personnel* to show that she could not be removed without cause during the middle of the year, but a defendant stated in a deposition that the Handbook applied only to non-teaching persons who do

not have faculty rank, and Bullock did not show otherwise. Finally, Bullock tried to rely on a TBR policy that required approval by the chancellor for changes in status of a dean or equivalent, but was unable to demonstrate that a director could be removed only with the approval of the chancellor. *Id*. at *3.

Similarly, in *Chauhan v. Baker*, 1988 WL 137332 (6th Cir. 1988) (unpublished), a case arising in Ohio, we upheld summary judgment in favor of defendants where the plaintiff had alleged in a section 1983 action that his removal as director of a university department's graduate program–although he remained a tenured professor and suffered no pay cut–violated his due process rights. We noted that the plaintiff's contracts with the university made no reference to his administrative position, and that a dean had repeatedly refused to tie plaintiff's tenure to his administrative position as well as his faculty position. We concluded that the university had given the plaintiff "no basis, beyond a year to year basis, that he would be retained as director." *Id*. at *1-2.

It is noteworthy that those cases were decided on summary judgment. Here we have no factual development as to, e.g., whether the ambiguously worded 1996 "notice of appointment and agreement of employment" from TSU meant to give Stringfield a tenure-track appointment in her directorship, in her faculty position, or both; what other arrangements, verbal or written, were made; the applicability and scope of the provisions in the Handbook; and what the relevant Tennessee and TSU policies may indicate. Under the relatively lenient standard of 12(b)(6), we cannot conclude, construing the complaint (and documents attached thereto) in a light most favorable to Stringfield, that she can prove no set of facts in support of her claims that she had a property interest in the

directorship and that it would have been clear to a reasonable person that terminating her from that

position (or "demoting" her, as the parties alternately state), was unlawful. *Cf. Jackson v. Schultz*,

429 F.3d 586, 589-90 (6th Cir. 2005). Accordingly, we reverse, and remand for further proceedings,

the district court's grant of the motion to dismiss Stringfield's property-interest-related claims on

the ground of qualified immunity.

**2**

Stringfield argues that the insertion of the allegedly erroneous letter from Graham into a

publicly-available personnel file, combined with Graham's removal of her from the directorship,

worked a violation of her liberty interest in her reputation.

"An injury to a person's reputation, good name, honor, or integrity constitutes the deprivation

of a liberty interest when the injury occurs in connection with an employee's termination." *Ludwig*

*v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997) (citing *Roth*, 408 U.S. at

573, and *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). We have stated that "[a] moral

stigma such as immorality or dishonesty is required to show a deprivation of liberty." *Ludwig*, 123

F.3d at 410. A plaintiff must meet a five-factor test to establish that she has been deprived of a

liberty interest and is entitled to a name-clearing hearing:

> First, the stigmatizing statements must be made in connection with the plaintiff's
> termination from employment. . . . Second, a plaintiff is not deprived of his liberty
> interest when the employer has alleged merely improper or inadequate performance,
> incompetence, neglect of duty or malfeasance. . . . Third, the stigmatizing statements
> must be made public. Fourth, the plaintiff must claim that the charges made against
> him were false. Lastly, the public dissemination must have been voluntary.

*Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002) (omissions in original) (quoting *Brown v. City of Niota*, 214 F.3d 718, 722-23 (6th Cir. 2000)).

It is clear that Stringfield does not meet the second test. Graham's letter merely alleges what amounts to, as *Quinn* put it, "improper or inadequate performance, incompetence, neglect of duty or malfeasance." Stringfield argues that Graham "essentially accused Dr. Stringfield of lying to her," citing a portion of the letter in which Graham wrote: "You insisted that the content was taught in the Nurs 250 lab. I invited Ms. Lamb, the Lab Instructor, to describe to the committee what she taught regarding drug calculations. Ms. Lamb was very clear in stating that she did not teach this content nor was she instructed to do so." J.A. 83. The passage indicates that Stringfield was ill-informed, rather than lying.

Furthermore, Stringfield cannot show that she had requested and been denied a name-clearing hearing. This court has stated that "[o]nce a plaintiff has established the existence of all five elements, he is entitled to a name-clearing hearing if he requests one. . . . It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Quinn*, 293 F.3d at 320 (citations omitted). We have consistently held that a failure of the plaintiff to request a name-clearing hearing bars due process claims for violations of a liberty interest. *Id.* at 321. Stringfield argues that her December 2003 letter to Graham constituted such a request. In *Ludwig*, this court ruled that a letter sent by the plaintiff's counsel to defendants alleging that they had violated plaintiff's due process rights did not amount to a request for a name-clearing hearing where it was "insufficient to alert [the defendants] that the Ludwig was complaining of a lack of due

process in connection with a liberty interest as opposed to a lack of due process in connection with his claimed property interest." 123 F.3d at 411. In her letter to Graham, Stringfield stated that her removal was "unfair and unjust" and that she was "not given due process," and that if Graham "had taken time to assess the situations [discussed in Graham's letter] and to talk with me about them you would have gleaned more information about each situation." Stringfield's letter did not indicate whether the complaint of lack of due process applied to her asserted liberty interest as opposed to her asserted property interest, and did not amount to a request for a name-clearing hearing. For that reason, as well as the fact that Graham's letter dismissing Stringfield from the directorship did not morally stigmatize Stringfield, we affirm the district court's dismissal of Stringfield's liberty-interest due process claim on the ground of qualified immunity.

**IV**

For the foregoing reasons, we affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.