RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HENRY J. KAPLAN, M.D.,

*Plaintiff-Appellant*,

*v*.

UNIVERSITY OF LOUISVILLE; TONI M. GANZEL, M.D.;
RONALD I. PAUL, M.D.; GREGORY C. POSTEL, M.D.,

*Defendants-Appellees*.

┐
│
│
├  No. 20-5965
│
│
┘

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:19-cv-00825—Charles R. Simpson, III, District Judge.

Argued:  March 4, 2021

Decided and Filed:  August 18, 2021

Before:  STRANCH, LARSEN, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Kevin L. Chlarson, MIDDLETON REUTLINGER, Louisville, Kentucky, for
Appellant.   Matthew Barszcz, DINSMORE & SHOHL LLP, Louisville, Kentucky, for
Appellees.  **ON BRIEF:**  Kevin L. Chlarson, Dennis D. Murrell, Christopher K. Stewart,
MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellant.  Matthew Barszcz, Donna
King Perry, Jeremy S. Rogers, Chase M. Cunningham, DINSMORE & SHOHL LLP, Louisville,
Kentucky, for Appellees.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.   This appeal concerns the University of Louisville's ("UofL")**[1]** decision to suspend, and eventually to fire, Dr. Henry J. Kaplan.  Kaplan served as both a tenured professor and the Chair of UofL's Department of Ophthalmology and Visual Sciences ("DOVS").  In October 2018, UofL informed Kaplan that it was reviewing some of his actions as Chair and considering removing him from that position.  These included his signing an unauthorized lease on behalf of DOVS and meeting with private equity firms interested in buying or financing DOVS.  One month into the investigation, with no more warning, UofL placed him on paid administrative leave and prohibited him from coming to university grounds and communicating with his colleagues.  The university also advised Kaplan that he could lose his tenured position.

When the investigation ended, Kaplan lost his Chair, and the dean of the medical school recommended UofL terminate his tenure, identifying six grounds for dismissal.  Kaplan appealed her recommendation to a faculty committee.  That committee gave Kaplan a two-day hearing, at which he introduced documents and witnesses supporting his defense.  It also upheld four of the six grounds for dismissal, including Kaplan's unauthorized lease and his perceived attempt to sell DOVS's clinical practice to private investors.  UofL's Board of Trustees terminated Kaplan's tenure.

Kaplan sued, claiming that UofL terminated him from both positions without due process.  He also alleged that UofL violated his Fourteenth Amendment liberty interests in his reputation and career along with his First Amendment right to academic freedom.  The district court dismissed all of Kaplan's federal claims on UofL's 12(b)(6) motion.  We **AFFIRM**.

---

**[1]**Kaplan's complaint names the University of Louisville and three administrators—Dr. Toni Ganzel, Dr. Ronald Paul, and Dr. Gregory Postel—as defendants.  This opinion refers to those four parties collectively, and to the university by itself, as "UofL."

**I.**

For most of his time at UofL, Kaplan's work was a resounding success. He joined UofL in 2000 as a tenured professor and Chair of DOVS. His most recent five-year review described his performance as "superb." That review credited Kaplan with growing DOVS's clinical practice, characterized anonymous reviews of his performance and demeanor as "nearly universally positive," and credited a third party's description of Kaplan as "one of the strongest clinician scientists in academic medicine right now." As a result, the reviewing committee unanimously recommended Kaplan for another term. UofL followed the recommendation and reappointed Kaplan through 2021.

Kaplan's relationship with UofL soured after the university announced cost-control measures in 2018. DOVS persistently operated at a deficit, although Kaplan had sharply increased the department's revenues in recent years. As part of these reforms, UofL planned to give DOVS's faculty doctors a fifteen percent pay cut. The faculty, predictably, complained to Kaplan, who feared both "an exodus" of doctors and difficulty hiring quality candidates in the future. The salary cuts, in his view, would make DOVS less profitable, less able to care for patients, and less competitive in the pursuit of research grants.

So Kaplan held a meeting with his senior faculty to address these concerns. He suggested pursuing private funding for DOVS. The response was "wholeheartedly positive," and nobody present objected to the idea.

Kaplan explored selling DOVS's clinical practice to a private equity group, which would allow DOVS to maintain its faculty's current salaries. As part of this effort, he secured conditional commitments from nine doctors willing to leave DOVS if Kaplan separated the practice from the medical school. But in considering their options, he and the faculty understood that UofL ultimately would have to approve any outside arrangement. Some of the faculty had noncompete clauses in their contracts, and the practice benefitted from the residency program and emergency room access UofL provided. Kaplan ultimately met with four private equity groups, including one that had recently bought an ophthalmology practice affiliated with the University of Cincinnati.

Even if Kaplan had secured private financing, DOVS would have needed to expand its physical space in Louisville.  As that office began treating more patients, more doctors requested time there.  Kaplan told UofL that his department needed more space and began negotiating a new lease, at $7,000 a month, in March 2018.  But circumstances prompted Kaplan to sign the lease before the administration authorized him to do so.  First, the property owner was about to begin negotiating with another potential tenant.  And second, Kaplan learned that the office housing DOVS's pediatric care practice was closing; that practice would fold unless new space became available.  Ten days after he signed the new lease, Kaplan met with UofL's Interim Executive Vice-President Dr. Greg Postel to explain why he had signed it.

In October 2018, Dr. Toni Ganzel (the Dean of the Medical School) and Postel summoned Kaplan to a meeting where they told him they were beginning to investigate his conduct as Chair.  The investigation, formally labeled a "special chair review," stemmed from concerns about Kaplan's unauthorized lease agreement, his reneging on an agreement that DOVS would lease space from the medical school despite its having made significant investments in reliance on his representations, his attempt to seek outside funding, and his creating an LLC "to spin-off" DOVS's clinical practice, among other things.  Kaplan denied any wrongdoing.  Even so, UofL placed him on paid administrative leave from his Chair for the length of the review.  Kaplan continued to work as a researcher, educator, and doctor.  Depending on the review's conclusions, Kaplan faced disciplinary action up to removal from his chair position.  UofL's special chair review would proceed according to the *Redbook*, the university's internal governing document.

Less than a month later, UofL cancelled Kaplan's scheduled interview with the special chair review committee hours before it was scheduled to begin.  Instead, Kaplan was told to meet with Ganzel and Dr. Ron Paul (the Vice-Dean for Faculty Affairs) the next day.  At that meeting, they advised Kaplan that the investigation into his conduct was being escalated from the special chair review to UofL's Compliance and Audit Services ("CAS"), that he was being placed on administrative leave with pay from his tenured position effective immediately, and that UofL might terminate his tenure.  On leave, Kaplan could "not engage in any activity on behalf of the University, including in [his] role as Chair, faculty member or physician."  (R.15-9, Jan. 23,

2019 Letter, at PID#566.)  UofL confiscated his desktop and ordered him to return his laptop. This investigation would also follow the *Redbook*.

Kaplan's suspension stalled his career.  He could not complete grant proposals, collaborate on research with faculty members, teach students, or even see his patients.  Kaplan saw thirty to forty patients a week before his leave.  But because his leave prohibited him from communicating with his colleagues at the hospital, he couldn't ensure they received alternative appointments.  He also could no longer contribute to upcoming grant proposals, and UofL removed him from at least one ongoing grant.  The university also told multiple organizations that Kaplan was no longer Chair before the investigation concluded.

CAS interviewed Kaplan in February 2019.  Kaplan acknowledged that he had shared some of DOVS's patients' financial data and discussed financing with private equity firms.  In part, he felt the administration had implicitly encouraged these conversations by directing DOVS to explore new sources of revenue.  But he explained that he never shared HIPAA-protected information with anyone and that he never shared any information at all before the other party had entered a non-disclosure agreement.  Plus, Kaplan understood that he could not have accepted any outside financing without UofL's approval.  However any potential financing might work out, DOVS's practice would maintain a relationship with UofL.  As for the unauthorized lease, Kaplan knew he technically needed approval from the finance committee but signed the lease without it because the finance committee kept postponing its meeting with him.

When the report came out two months later, CAS recommended "appropriate disciplinary action, up to and including termination" of Kaplan's Chair and tenure.  (R.15-11, CAS Rep. at PID#572.)  That report faulted Kaplan for the unauthorized lease, which it characterized as evidence that he "actively" "worked to undermine the budget reduction plan."  (*Id.* at PID#577.)  It also revealed other financial chicanery and mismanagement.  Kaplan tried multiple times after the budget reductions were announced to give his faculty doctors raises, which UofL repeatedly vetoed.  DOVS also hadn't made certain required payments—known as academic program support payments—to UofL since 2015.  These payments were worth as much as $1.1 million a year.

Kaplan had also reneged on an expensive agreement with the medical school. Before signing the unauthorized lease, Kaplan told UofL that he wanted DOVS to have space in the medical school's new pediatrics building. Based on this representation, UofL paid for renovations to specialize some space for ophthalmology. More than $335,000 of equipment was ordered for the new space. But he eventually cancelled the move, rendering the renovations worthless. At the time of the report's publication, the equipment remained in boxes.

The CAS Report also explained the details of Kaplan's alleged attempt to sell DOVS's clinical practice. During the summer of 2018, Kaplan obtained DOVS's patient data. He went around the appropriate university channels to get it, which meant that his use of it wasn't subject to UofL's usual security and monitoring. Kaplan, for a time, possessed the social security numbers, names, and addresses of more than 33,000 DOVS patients. In the fall, he registered an LLC, Louisville Eye Specialists, with the State of Kentucky. Its stated purpose was to provide ophthalmology and optometry services. That LLC eventually shared financial information with a private equity group. In return, the financiers sent both a proposed pitch for potential buyers and a contract offering to help facilitate a sale of Louisville Eye Specialists for a retainer and a cut of the sale. The pitch included line items for a "Dean's Tax" and "Academic Mission," as well as recent yearly revenues north of $5 million. The two entities held a phone call, with an independent accountant, to discuss the details. CAS never located an executed contract, but UofL was nervous enough about what Kaplan had shared that it retained an outside forensics firm to evaluate its liability under federal privacy law.

In August 2019, Ganzel told Kaplan that she was recommending UofL terminate his tenure. That same day, Paul emailed Kaplan to let him know the special chair review had received and considered the CAS report. He invited Kaplan to submit a written response to the report, which the special chair review would discuss before making final recommendations to the administration. Kaplan's attorneys responded with two letters disputing the CAS Report, but the special chair review recommended that Ganzel remove Kaplan anyway. UofL formally terminated Kaplan's Chair on October 24, 2019.

The dispute over Kaplan's tenured position took longer to resolve. Ganzel recommended UofL dismiss Kaplan on six grounds: 1) trying to separate DOVS from UofL, 2) misrepresenting data from DOVS's practice as data held by a private practice, 3) storing HIPAA-protected patient data on cloud storage devices without authorization, 4) failing to disclose financial conflicts of interest, 5) disrespecting administrative staff, and 6) undermining UofL's budget reduction plan. She advised Kaplan that he could appeal her recommendation to a faculty grievance committee.

So he did. UofL gave him a two-day hearing, at which he presented witnesses and documents. The faculty grievance committee determined that Kaplan had committed the first, second, fourth, and sixth grounds Ganzel described in her letter. But they did not agree that he'd stored HIPAA-protected data in the cloud or disrespected administrative staff.

After such hearings, the *Redbook* requires the faculty committee to note if it determined that "the [university's] evidence has not established adequate cause for dismissal in the record." (*See* R.15-26, *Redbook*, at PID#728.) After Kaplan's hearing, since Ganzel hadn't established every ground in her charging letter, the committee made "no finding as to whether" Kaplan's "termination was warranted." (R.15-28, Findings and Op. of Hr'g Panel, at PID#736.)

UofL's President recommended the Board of Trustees terminate Kaplan's tenured position, which the Board did at its next meeting.

Upon his termination, Kaplan filed the operative complaint, bringing several constitutional claims under 42 U.S.C. § 1983. He alleged that UofL, Paul, Postel, and Ganzel denied him procedural due process in their terminations of his Chair and of his tenured position. He is suing the three individual administrators in their personal, not their official, capacities. Kaplan also alleged deprivations of certain liberty interests and of his academic freedom. UofL moved to dismiss for failure to state a claim. The district court granted the motion on all of Kaplan's federal claims, and this appeal followed.

**II.**

We review de novo the dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6). *Brent v. Wayne Cnty. Dep't of Hum. Servs.,* 901 F.3d 656, 675–76 (6th Cir. 2018). We will affirm the dismissal unless we conclude that Kaplan's operative complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reaching this decision, we can review exhibits attached to the complaint. *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017). When an exhibit contradicts the complaint, "the exhibit trumps the allegations." *Id.*

**III.**

**A. UofL's Sovereign Immunity.**

The university argues that sovereign immunity bars Kaplan's claims against it. "The University of Louisville is a state agency cloaked with Eleventh Amendment immunity." *Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 960 (6th Cir. 1986).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. But "the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 753 (2002). This immunity "bar[s] a citizen from suing his own State under the federal-question head of jurisdiction." *Alden v. Maine*, 527 U.S. 706, 727–28 (1999) (citing *Hans v. Louisiana*, 134 U.S. 1, 14–15 (1890)).

Plaintiffs have two possible paths around a State's sovereign immunity. "First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Neither party alleges that any federal statute arguably does so here. "Second, a State may waive its sovereign immunity by consenting to suit." *Id.* That hasn't happened here either. "A State's

consent to suit must be unequivocally expressed in the text of [a] relevant statute." *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (internal quotation marks omitted). Yet neither party points us to any Kentucky statute waiving its immunity for such suits.

Kaplan next tries to shoehorn his claims into the *Ex parte Young* doctrine. This effort fails. *Ex parte Young* allows plaintiffs to bring "a suit challenging the constitutionality of a state official's action." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) (discussing *Ex parte Young*, 209 U.S. 123 (1908)). But the University of Louisville is not a state official, and Kaplan is suing the individual administrators in their personal capacities. So *Ex parte Young* doesn't apply. *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 416–17 (6th Cir. 2019).

We **AFFIRM** the district court's grant of sovereign immunity to the University of Louisville.

**B. Kaplan's Fourteenth Amendment Procedural Due Process Claims.**

Kaplan argues that UofL suspended him from his Chair and suspended him with pay from his tenured position without due process. To state a claim for a violation of procedural due process, Kaplan must plead a property interest protected by the Due Process Clause, a deprivation of this property interest, and that the State did not give him adequate procedural rights to protect against an erroneous deprivation. *See Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

The Fourteenth Amendment's Due Process Clause forbids States from "depriv[ing] any person of life, liberty, or property[] without due process of law." U.S. Const. amend. XIV, § 1. In practice, we address procedural due process claims in two steps. First, we determine whether a constitutionally protected property interest is at stake. *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017). Second, we consider the procedures necessary to protect that interest. *Id.*

The Constitution does not create or define property interests, though. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Rather, courts identify property interests by reference to independent sources of entitlement such as state law or a contract between the parties. *See id.* at

577–78; *Crosby*, 863 F.3d at 552. For instance, a job or government benefit is a property interest if there are "rules or mutually explicit understandings that support [a plaintiff's] claim of entitlement to" it. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). But neither a "unilateral expectation" to enjoy the alleged property interest nor an "abstract need or desire for it" is enough. *Roth*, 408 U.S. at 577. "The hallmark of property is an individual entitlement grounded in state law, which cannot be removed except for cause." *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)) (cleaned up). "Although the underlying substantive interest is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 757 (2005) (internal quotation marks and emphasis omitted) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)). The Supreme Court has thus held that tenured professors at public institutions have a protected property interest in their continued appointment. *Roth*, 408 U.S. at 576–77; *Sindermann*, 408 U.S. at 601–03.

"Due process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (alteration omitted) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'") (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

But the Supreme Court has rejected "the proposition that due process always requires the State to provide a hearing prior to the initial deprivation of property." *Gilbert*, 520 U.S. at 930 (quotation omitted) (cleaned up). In other words, the Court is generally hostile to bright-line rules in the procedural due process context. *See id.* (observing that "absolute rule[s]" are "indefensible"). Instead, "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Id.* (collecting cases).

We balance three factors when deciding how much process the Constitution requires before a State may fire or suspend a tenured public employee. *See id.* at 931–32. These are "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and "the Government's interest." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The relative weight of each factor determines how much process a public employee, such as a tenured professor, must receive before being fired or suspended. *See, e.g.*, *Sonnleitner v. York*, 304 F.3d 704, 713 (7th Cir. 2002) ("*Gilbert* . . . clarifies that the *Mathews* three-part balancing test is the proper standard for analyzing a procedural due process claim of a government employee who has a property interest in his or her job and subsequently suffers an adverse employment action."); *see also Frumkin v. Bd. of Trs., Kent State Univ.*, 626 F.2d 19, 19–22 (6th Cir. 1980) (*Mathews* applied to a university's removal of a tenured professor for "unsatisfactory performance" and "unprofessional conduct," among other reasons); *Walsh v. Hodge*, 975 F.3d 475, 481–85 & n.12 (5th Cir. 2020) (*Mathews* applied to a university's termination of a contract employee, who had for cause protection, after accusation of sexual harassment); *Collins v. Univ. of N.H.*, 664 F.3d 8, 10, 16–19 (1st Cir. 2011) (*Mathews* applied to a university's suspension of a tenured professor for criminal disorderly conduct and stalking).

### 1. Kaplan does not have a property interest in his Chair.

As a general rule, "Sixth Circuit caselaw establishes that 'tenured university professors do not have a constitutionally protected property interest in administrative posts.'" *Crosby*, 863 F.3d at 552–53 (quoting *Stringfield v. Graham*, 212 F. App'x 530, 538 (6th Cir. 2007)) (alteration adopted). But we still evaluate situations like Kaplan's for "a legitimate claim of entitlement." *Roth*, 408 U.S. at 577. Conducting this analysis previously, we've suggested that there are two potential exceptions to our general rule. First, a professor may have a property interest in an administrative position that is itself a tenure-track appointment. *Crosby*, 863 F.3d at 553 (summarizing *Stringfield*, 212 F. App'x at 537–39). Alternatively, an express guarantee that the employee holds the administrative post subject to removal for cause might create a property interest. *Id.* (summarizing *Garvie*, 845 F.2d at 651–52).

Kaplan is not in either of these situations, and the record betrays any "legitimate claim of entitlement" to his Chair. His complaint and briefs never allege that he held his Chair subject only to for cause removal. And Kaplan's Chair is not a tenure-track appointment. Kaplan was in the middle of a five-year term, set to end in 2022. At the end of that term, he would be reviewed with no guarantee of reappointment. Even if UofL had reappointed him to another term, Ganzel, as Kaplan's supervising dean, retained the power to recommend his removal "at any time for any reason that is not illegal or arbitrary." (*See* R.15-26, *Redbook*, at PID#711.) Indeed, every department Chair at UofL "serve[s] at the pleasure of the Board of Trustees and may be removed at any time upon the recommendation of the President." (*Id.* at PID#710.)

Kaplan's briefs, rather than applying either of these exceptions, or trying to carve out a new one, analogize his claim to *Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009). But Kaplan misunderstands *Gunasekera*. There, a tenured professor and department chair argued that the administration violated due process by suspending his Graduate Faculty status without "notice and a meaningful opportunity to be heard." *Id.* at 464. That status, the plaintiff alleged, was "a right intrinsic" to his tenured professorship so long as he met and maintained four criteria defined by the university. *Id.* at 467. In practice, other faculty enjoyed Graduate Faculty status so long as they met the criteria, and the university had never revoked or suspended a professor's Graduate Faculty status before. *Id.* at 467–68. Without it, the plaintiff lost his ability to advise graduate students, his right to a reduced teaching load, and a designated stipend. *Id.* at 464, 468.

*Gunasekera* does not establish that Kaplan had a property interest in his Chair. First, UofL has no established criteria that allow someone to serve as Chair in perpetuity. Quite the opposite; Kaplan "serve[d] at the pleasure of the Board of Trustees." (*See* R.15-26, *Redbook*, at PID#710, 711.) Second, Kaplan's Chair is a separate appointment, not "a right intrinsic" to his professorship. *Compare Gunasekera*, 551 F.3d at 467, *with* (R.15-5, Nov. 15, 2019 Letter, at PID#538 (listing Kaplan's Chair and Kaplan's tenured professorship as independent positions).). *Gunasekera* establishes that someone holding a protected position has a property interest in job duties that have defined qualifications and for which he receives extra pay. *See Gunasekera*, 551 F.3d at 468.

This case more neatly tracks *Garvie*. The plaintiff there, a tenured professor, sued the University of Tennessee after it notified him that it would not renew his appointment as a department head. *Garvie*, 845 F.2d at 649. And—like the *Redbook* here—the applicable faculty handbook in *Garvie* made clear that department heads "carrie[d] no tenure" and were "renewed at the discretion" of the administration. *Id.* at 651. The *Garvie* plaintiff also claimed that the administration's "oral explanations" gave him a property interest in his position. *Id.* at 648. We disagreed in part because the plaintiff provided no evidence of these representations. *Id.* at 651. Indeed, the letter explaining his appointment to him noted that "all department heads . . . serve at the pleasure of the Chancellor." *Id.* Kaplan similarly "serve[d] at the pleasure of the Board of Trustees," (see R.15-26, *Redbook*, at PID#710), and he never alleges any oral representation of tenure.

"In sum, [Kaplan] has pointed to no state statute, formal contract, or contract implied from the circumstances that supports his claim to a protected property interest in his position as Chair." *See Crosby*, 863 F.3d at 554. So we don't have to consider whether his removal from that position complied with due process. No process was due.

### 2. UofL provided Kaplan with procedural due process when it suspended—and later terminated—him from his tenured position.

Tenured public university professors have a property interest in their employment. *Roth*, 408 U.S. at 576–77.**[2]**

We balance the three *Mathews* factors to evaluate a tenured professor's claim that he was denied property without due process. That analysis opens with Kaplan's interest. The Supreme Court has repeatedly "recognized the severity of depriving someone of the means of his livelihood." *Gilbert*, 520 U.S. at 932; *see also Roth*, 408 U.S. at 589 (Marshall, J., dissenting) ("[T]he denial of public employment is a serious blow to any citizen."). An employee has an interest in maintaining his income: finding a new job often takes time and "is likely to be

---

**[2]**The Supreme Court, for its part, has explicitly held open "whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." *Gilbert*, 520 U.S. at 929. So, like it, we assume the question away here. *Id.*

burdened by the questionable circumstances under which he left his previous job." *Loudermill*, 470 U.S. at 543. Besides the significance of the interest, we must also weigh "'the length' and 'finality of the deprivation.'" *Gilbert*, 520 at 932 (emphasis omitted) (quoting *Logan*, 455 U.S. at 434). A suspension followed by a "sufficiently prompt postsuspension hearing" is necessarily shorter than a termination, and it is not final. *See id.* And so, the Supreme Court has looked favorably on the practice of suspending employees with pay to minimize due process issues. *See Loudermill*, 470 U.S. at 544–45.[3]

---

[3]UofL argues that *Loudermill* established a safe harbor for paid suspensions. (Appellees' Br. at 20.) And the district court suggested as much in its decision below, citing our opinion in *Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999) *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002). (*See* R.24, Op. & Order, at PID#896–99.)

We think *Gilbert* dispels the notion that *Loudermill* established a per se safe harbor for all paid suspensions. *See Gilbert*, 520 U.S. at 931 ("Whatever implication the phrase 'with pay' might have conveyed is far outweighed by the clarity of our precedents which emphasize the flexibility of due process."). Rather, *Mathews* requires us to also consider "'the length' and 'finality of the deprivation,'" together with the property interest's significance. *Id.* at 932 (emphasis omitted) (quoting *Logan*, 455 U.S. at 434).

To the extent that a paid suspension might insulate an employer from § 1983 liability, it does so because the Due Process Clause only protects "significant property interest[s]." *Memphis Light*, 436 U.S. at 19; *see also Goss v. Lopez*, 419 U.S. 565, 576 (1975) (holding that the protections of the Due Process Clause attach only "as long as a property deprivation is not de minimis"). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Town of Castle Rock*, 545 U.S. at 757 (emphasis omitted) (quoting *Memphis Light*, 436 U.S. at 9); *Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*, 767 F.2d 270, 272 n.1 (6th Cir. 1985) (per curiam) (two-day suspension without pay was "de minimis and not deserving of due process consideration" where routinely used by the institution as employee discipline); *see also Progressive Credit Union v. City of New York*, 889 F.3d 40, 51–52 (2d. Cir. 2018) ("To determine whether a constitutionally cognizable property right is implicated, we look to whether the interest involved would be protected under state law and then we weigh the importance to the holder of the right.").

*Jackson* is not to the contrary. The plaintiff in *Jackson* failed to allege any loss of "pay or benefits" associated with his challenged suspension. *Jackson*, 194 F.3d at 749. A plaintiff who pleads that he has retained his job, his pay, and his benefits, while providing no further context, will have grave difficulty pleading a significant deprivation of property. And *Gilbert* implies that even an unpaid suspension, of appropriate length, will comply with due process. *Gilbert*, 520 U.S. at 932, 934–35.

Of course, that's not necessarily to say that the plaintiff in *Jackson* could not have alleged a cognizable property interest, just that he failed to do so. Consider *Gunasekera*. In that case, we reasoned that a "reduced teaching load" was a "benefit" under *Jackson*, potentially implicating the Due Process Clause. *Gunasekera*, 551 F.3d at 468. But it isn't clear that pleading a lost "benefit" is a necessary or sufficient condition to establish a property interest. The *Gunasekera* plaintiff also pleaded a lost stipend, which we characterized as "pay" under *Jackson*. *Id.* Combined, those deprivations "suffice[d] to allege that his suspension is a deprivation of property." *Id.* We take no position on whether pleading "benefits" alone, like Kaplan did here, instead of with some loss of "pay," implicates the Due Process Clause.

UofL placed Kaplan on paid leave from his tenured position while its investigation proceeded. And Kaplan has never asserted that his paid leave cost him any income. For example, no claim for lost income appears on the face of Kaplan's complaint. Indeed, he goes so far as to disclaim one. (R.15, Am. Compl., at PID#508 ("Dr. Kaplan enjoyed a broader property interest in his tenured position(s) than continued receipt of a paycheck including research, receipt of grants, engagement in scholarship, and maintenance of his standing in academia.").) We asked Kaplan's counsel at argument if Kaplan had alleged any loss of income here. His counsel said Kaplan had not. Oral Arg. at 9:31-10:29.

We make two assumptions at this point, both of which favor Kaplan. First, we assume, without deciding, that UofL deprived Kaplan of a cognizable property interest when it suspended him from the responsibilities (research opportunities, clinical practice, teaching, etc.) associated with his tenured position. Second, we further assume that the Due Process Clause protects this interest.

We must weigh this interest against UofL's interest in Kaplan's removal. When government entities "must act quickly," "where it would be impractical," or "where the employer perceives a significant hazard in keeping the employee on the job," the government need not provide predeprivation process. *Gilbert*, 520 U.S. at 929–30; *Loudermill*, 470 U.S. at 544–45. The government also has an interest in managing its budget. *See Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 902 (6th Cir. 2019) (acknowledging "the government's legitimate interest in preserving fiscal and administrative resources"); *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1193–94 (10th Cir. 2006) (recognizing a public school district's interest in immediately suspending an administrator who had overseen "an unexpected multi-million dollar deficit").

Kaplan's complaint makes UofL's interest in placing him on paid leave clear. In the face of university-wide budget cuts, Kaplan, the Chair of an unprofitable department, entered an unauthorized lease worth $7,000 a month. Kaplan later admitted he knew this was improper at the time. That incident followed the purchase of more than $335,000 of new equipment, which UofL couldn't use after Kaplan backed out of a related agreement. And the administration knew about Kaplan's creating an LLC to share DOVS's financial information with investors and his

efforts to obtain private financing. Ganzel and Postel warned Kaplan that these efforts could compromise UofL's existing financial arrangements. For a university navigating a budget crisis, this is a fearsome prospect. Postel's letter also conveys her concern that Kaplan may try to "spin-off" DOVS's clinical practice, which was generating increasing amounts of revenue. The CAS Report listed "the loss of clinical revenues" from DOVS as one way Kaplan's actions could harm UofL.

Rather than reassure the administration that he would stop looking for private financing, Kaplan "denied all allegations of seeking a 'loan' to finance departmental activities" and "denied any commitment whatsoever to an investment group to 'spin off' [DOVS's] practice." (R.15, Am. Compl., at PID#487.) These denials end far short of any commitment to stop pursuing outside financing, or even to coordinate these efforts with UofL going forward.

UofL communicated its concerns to Kaplan almost a month before it placed him on administrative leave. And Kaplan's complaint doesn't reveal any efforts during the interim to address the administration's concerns. Given the perceived risk Kaplan's conversations with private equity groups posed to UofL's existing financing, UofL's fear of losing revenue from DOVS's clinical practice, Kaplan's failure to coordinate his effort to obtain financing with the administration, Kaplan's prompting the university to renovate a new space and purchase equipment for DOVS only to back out of the arrangement, and Kaplan's demonstrated willingness to act without authorization, UofL had an acute interest in preventing Kaplan from acting on the university's behalf. For situations like these, UofL's *Redbook* reserves the university's right to terminate a faculty member's tenure for "[n]eglect of or refusal to perform one's duty" that "substantially impairs [his] effectiveness as a faculty member." (*See* R.15-26, *Redbook*, at PID#724.)

Finally, we ask whether "additional or substitute procedural safeguards" would have helped the government avoid "baseless or unwarranted" discipline. *Gilbert*, 520 U.S. at 931–32. A "sufficiently prompt postsuspension hearing" can cure deficiencies in the predeprivation process. *Id.* at 932. Of course, the denial of procedures with great probative value, such as cross-examination, may help establish that due process was denied. *See Walsh*, 975 F.3d at 484–85 (determining that some form of real-time cross examination, though not

necessarily by the accused, is necessary for due process in the university disciplinary setting). Ultimately, it may be the case that a terminated employee received all the process he was due. *See Gilbert*, 520 U.S. at 935–36; *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (concluding there was "no value to additional procedural safeguards" where the tenured professor met with university officials, submitted written responses, and received "a detailed explanation of the charges and the evidence against him" before termination).

That's the case here. How much benefit might more procedural safeguards have had in preventing an erroneous paid suspension? The record suggests little. Kaplan eventually sat for an interview with the investigators, filed a written response to CAS's report, and received a two-day hearing at which he called witnesses and introduced his own evidence. He even defeated two of the six grounds on which UofL sought his termination. Despite that Cadillac plan of due process, the faculty who heard Kaplan's appeal concluded that he had undermined UofL's budget reduction efforts and had tried to separate DOVS's clinical practice from UofL. Either charge independently justified his termination.

Kaplan notes that he defeated two of Postel's reasons for recommending his termination. And even after considering the remaining four grounds, the faculty committee declined to recommend his termination. True enough. But we have held that a terminated professor received adequate due process even where a majority of the faculty committee reviewing his grievance voted against his termination. *See Frumkin*, 626 F.2d at 21–22 (trustees voted for the university president's recommendation to terminate a tenured professor despite the majority of a faculty committee recommending against dismissal). So an ambivalent faculty committee is not a sufficient reason to conclude that Kaplan was denied due process.

Would providing this process to Kaplan sooner have helped him? It is hard to see how. The basis for his dismissal included two grounds that Kaplan had learned about back in October 2018, the unauthorized lease and the preparation to sell DOVS's practice. At some point over the next month, however, UofL sought greater discipline against Kaplan. The record reflects that during UofL's investigation it eventually learned about Kaplan's taking 33,000 patients' data from DOVS without permission, Kaplan's soliciting his doctors for commitments to leave with him if he secured outside funding, Kaplan's failure to make DOVS's required academic program

support payments to UofL, and Kaplan's discussions with a private equity group about a presentation pitching his new LLC's alleged financial information to potential investors. It's unclear how UofL processing Kaplan's discipline faster, and uncovering this information sooner, could have changed UofL's decisions to place Kaplan on paid leave and—eventually—to terminate his tenure.

In sum, UofL prevented Kaplan from seeing patients, teaching, or conducting research for over a year. But the university never stopped paying him. And Kaplan's extensive postdeprivation proceedings concluded that termination, a harsher penalty than suspension with pay, was appropriate. Before UofL initially suspended Kaplan, the school knew he had signed an unauthorized lease, overseen DOVS's $335,000 purchase of equipment and withdrawal from its agreement to use that equipment, and registered Louisville Eye Specialists with the State of Kentucky. The additional information considered by the faculty committee that reviewed Kaplan's termination—that Kaplan had sent patient data from DOVS to a private equity firm for use in an investor pitch, secured commitments from other doctors to leave DOVS if he secured that outside financing, and withheld compulsory payments to UofL—only hurt Kaplan's case. Under these circumstances, Kaplan received due process.

We **AFFIRM** the district court's dismissal of Kaplan's procedural due process claims.

### C. Kaplan's Fourteenth Amendment Liberty Interests.

The Fourteenth Amendment's Due Process Clause forbids States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Kaplan alleges that UofL deprived him of his liberty interests in his reputation and his career without providing him due process.

#### 1. Reputation.

Among the protected liberty interests are "[a] person's reputation, good name, honor, and integrity." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)). "Some alteration of a right or status 'previously recognized

by state law,' such as employment, must accompany the damage to reputation" to make out a due process violation. *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)).

Kaplan must plead five elements to state a claim for deprivation of his liberty interest in his reputation.

> "First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty, or malfeasance. Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary."

*Id.* at 320 (quoting *Brown v. City of Niota*, 214 F.3d 718, 722–23 (6th Cir. 2000)) (alterations adopted). If the plaintiff pleads these elements, he is entitled to a name-clearing hearing upon request. *Id.* "[A] plaintiff's failure to request a name-clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process." *Id.* at 323. It is the denial of a requested name-clearing hearing that deprives the plaintiff of his liberty interest without due process. *Id* at 320.

Kaplan admits that he never requested a name-clearing hearing from UofL. Instead, he makes four arguments for why we should excuse this failure. We reject each of them. And because this failure resolves the issue in UofL's favor, we express no opinion on which, if any, of the other five elements Kaplan adequately pled.

First, Kaplan argues that he can't be responsible for his failure to request a name-clearing hearing because the *Redbook* does not provide for one. But employers have no "affirmative duty" to advise employees about their potential entitlement to a name-clearing hearing. *Quinn*, 293 F.3d at 323. And it isn't surprising that the *Redbook* wouldn't describe how a name-clearing hearing might proceed. Name-clearing hearings, if requested by an eligible employee, must be tailored to afford the grievant an opportunity to clear his name commensurate with the deprivation. *See Chilingirian*, 882 F.2d at 205–06.

Second, Kaplan says UofL refused to toll the statute of limitations for his lawsuit to let disciplinary processes conclude before he filed his complaint. That is true. But that is also a red herring; UofL's refusal to toll the statute of limitations in no way prevented Kaplan from requesting a name-clearing hearing.

Kaplan's third and fourth arguments come from *Claborn v. Montgomery*, No. 2:11-cv-679, 2012 WL 4056845 (S.D. Ohio Sept. 14, 2012), an unpublished district court decision from our circuit. He argues that any request would've been futile and that his lawsuit substitutes as his name-clearing hearing. But *Claborn* did not, as Kaplan suggests, recognize a futility exception to the requirement that plaintiffs request name-clearing hearings. Rather, it was the plaintiff's lawsuit, not her failure to request a name-clearing hearing, that *Claborn* characterized as "futile." *See Claborn*, 2012 WL 4056845, at *4.

Kaplan's fourth argument, that his lawsuit functions as a name-clearing hearing, also misreads *Claborn*. The district court in *Claborn* found that the plaintiff's criminal trial served as her name-clearing hearing because it gave her "the opportunity to be heard and refute the charges made against her." *Claborn*, 2012 WL 4056845, at *4. This situation is factually inapposite for two reasons. First, Ohio's Bureau of Workers' Compensation and Industrial Commission fired the plaintiff in *Claborn* for allegedly misusing state equipment. *Id.* at *1, 5. So, in a sense, the entity that fired her was the same entity that provided her criminal trial/name-clearing hearing—the State of Ohio. The federal courts adjudicating Kaplan's lawsuit are not part of the State of Kentucky. And second, the prosecution in *Claborn* went to the truth of the same conduct for which the plaintiff there had been fired: Did she misuse state resources? Kaplan's lawsuit, however, is concerned with procedural and substantive due process. Whether he received due process doesn't depend on whether he did the things for which UofL fired him. Even a victory in this lawsuit would not have the name-clearing benefit of an acquittal.

We **AFFIRM** the district court's dismissal of Kaplan's claim that UofL deprived him of a liberty interest in his reputation.

**2. Career.**

Kaplan next alleges that UofL infringed his liberty interest in his career. But Kaplan nowhere alleges that UofL denied him the "freedom to choose and pursue a career, 'to engage in any of the common occupations of life.'" *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir. 1989) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Nor could he. Doing so required Kaplan to plead state action that precluded him from engaging in his profession anywhere in the state. *See id.* at 831–32 (distinguishing *Meyer*'s statewide prohibition and the statewide interference in *Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir. 1983), from an untenured professor's claim that one public university's decision to not renew his contract deprived him of a liberty interest). Kaplan's claim fails because it involves only a singular position—as a tenured faculty member—at a singular employer—the University of Louisville. *See id.* at 832.

This is the same reason the plaintiff's liberty interest claim failed in *Parate*. There, a non-tenured professor sued Tennessee State University for refusing to renew his contract. *Id.* He said this was retaliation for his refusal to change a student's grade. *Id.* at 823–25. The university countered that his contract's expiration was reason alone to let him go. *Id.* at 832. We agreed. *Id.* at 833. Indeed, parts of *Parate* could have been written for this case. Kaplan "was not denied the choice of his career[] but remains free to pursue his chosen profession at another university," "has only been discharged from one state university," and "can pursue the teaching profession at any public or private university that requests his services." *Id.* at 831–32 (emphasis omitted).

Contrasting *Parate* with *Meyer* and *Wilkerson* sharpens this distinction. In *Meyer*, the State of Nebraska criminalized teaching German in any school to a student who hadn't finished eighth grade. *See Meyer*, 262 U.S. at 397 (quoting the criminal statute: "No person, individually or as a teacher, shall, in any private, denominational, parochial or public school, teach any subject to any person in any language [other] than the English language.").

*Wilkerson*, like *Meyer*, also involved state action that prevented the plaintiffs from engaging in their profession statewide. The plaintiffs—barbers—sued members of the state agency regulating barber shops for "conspir[ing] to harass and deprive them of the right to

pursue their occupations." *Wilkerson*, 699 F.2d at 327. The regulators, at various times, refused to let the plaintiffs sit for the state's licensing exam and demanded they refurbish their shop above and beyond what state law required. *Id.* at 326–27. We determined that the regulators had violated plaintiffs' liberty interests by allowing "prejudice and bias" to influence their "regular and impartial administration of public rules." *Id.* at 328.

Neither of these cases reflects Kaplan's situation. UofL is not regulating his entry into a profession. *See Parate*, 868 F.2d at 831–32 (citing *Wilkerson* and distinguishing between limiting a person's ability to enter a profession from their ability to hold a specific job). And unlike the plaintiff in *Meyer*, whom the state legislature prevented from "teaching German at any school in the state," Kaplan can "pursue the teaching profession at any public or private university that requests his services." *See id.* at 832 (distinguishing *Meyer*). Rather, UofL disciplined a faculty member according to its internal procedures.

"[T]he nature and seriousness of the alleged governmental interference" and "the strength of the justification given" confirm our conclusions. *See id.* at 831. To be sure, placing Kaplan on a prolonged administrative leave while investigating his conduct interfered with his medical practice, teaching, and ongoing research. But Kaplan collected his full paycheck for the length of the investigation, and his counsel waived any argument to the contrary here. UofL needed to ensure its faculty would implement its new cost-control measures. So a temporary paid suspension of Kaplan while the investigation ran its course, did not deprive Kaplan of a constitutionally protected liberty interest in his career.

We **AFFIRM** the district court's dismissal of Kaplan's claim that UofL deprived him of a liberty interest in his career.

### D. Kaplan's First Amendment Right to Academic Freedom.

Kaplan next alleges that UofL's decision to place him on paid administrative leave from his tenured position violated his academic freedom. This argument repackages the same deprivations Kaplan raised in his procedural due process argument concerning his tenured position. They are better situated there. Kaplan misconstrues academic freedom, which is concerned with retaliatory censorship, not routine discipline.

Kaplan failed to allege that UofL's decision to place him on leave was an "attempt[] to control or direct the content of the speech engaged in by the university or those affiliated with it." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 197 (1990) (emphasis omitted). He does allege that his suspension affected ongoing grant proposals. But alleging that the quality of UofL's scholarship might decline is not enough to sustain a claim for deprivation of academic freedom. *Id.* at 198.

Although the Supreme Court has never outlined "the precise contours of any academic-freedom right," Kaplan's claim does not fit neatly into its previous cases. *See id.* Kaplan's suspension is not a "content-based regulation." *Id.* at 197. Nor has Kaplan alleged that UofL "attempt[ed] to control or direct the content of [his] speech." *Id.* Although he has specific academic specialties (e.g., uveitis), neither party argues that these informed UofL's decision to suspend Kaplan (i.e., to reduce the level of research or support of ideas related to uveitis). It is not the case that every suspended professor can state a First Amendment claim because the suspension directs university resources away from their specialties. (*See* Appellees' Br. at 33.)

Simply put, UofL suspended Kaplan because of his attempts to circumvent UofL's cost-control measures and not because of any ideas he advocated or research he conducted. This distinguishes his claim from academic freedom claims the Supreme Court has recognized. *See, e.g.*, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 592–94, 609–10 (1967) (invalidating New York law making membership in the Communist party prima facie evidence of disqualification from teaching in state universities). Kaplan has not alleged a violation of his First Amendment academic freedom.

We **AFFIRM** the district court's dismissal of Kaplan's claim that UofL deprived him of his academic freedom under the First Amendment.

### E. Injunctive or Declaratory Relief.

We also **AFFIRM** the district court's denial of Kaplan's claims for injunctive and declaratory relief. "Injunctive relief is not a cause of action, it is a remedy." *Thompson v. JPMorgan Chase Bank, N.A.*, 563 F. App'x 440, 442 n.1 (6th Cir. 2014) (internal quotation marks omitted). Because Kaplan has failed to state a claim for any constitutional deprivation under § 1983, he is not entitled to injunctive relief on such a claim. And since we have resolved

all the substantive issues in his appeal, a declaratory judgment would no longer "serve a useful purpose in clarifying the legal relations at issue." *See Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 812–13 (6th Cir. 2004).

## IV.

We **AFFIRM** the district court's judgment.