

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00345-CV

———————————————

VIVIAN CASPER, Appellant

V.

TEXAS WOMAN'S UNIVERSITY, ABIGAIL TILTON, SHANNON SCOTT, GENEVIEVE WEST, SYMONE OSIEKO, CARINE FEYTEN, CAROLYN KAPINUS, AND KATHERINE ANTWI GREEN, Appellees

---

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 22-0364-431

---

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

After being placed on paid administrative leave from her tenured professorship, Appellant Vivian Casper sued Appellees Texas Woman's University (TWU) and seven TWU administrators in their official capacities (the Individual Administrators), alleging that her rights to due process and free speech were violated. The trial court granted Appellees' plea to the jurisdiction, which attacked Casper's pleadings on immunity grounds. Casper argues on appeal that (1) the individual administrators were not entitled to immunity in their official capacities; (2) she properly pleaded due process violations; (3) she properly pleaded First Amendment violations; and (4) alternatively, the trial court erred by not allowing targeted discovery to help determine jurisdictional facts. We will affirm.

## I. BACKGROUND

### A. CASPER IS PLACED ON PAID LEAVE

Casper is a tenured English professor at TWU and has taught there for more than 50 years. After a student filed a complaint alleging that Casper had demeaned and discriminated against her based on race and disability, TWU opened an investigation and placed Casper on paid administrative leave. At the close of the investigation, TWU concluded that there was sufficient evidence to support some of the student's allegations. But TWU chose not to terminate Casper. Rather, it allowed Casper to retain her tenure, salary, and benefits but has not assigned her any teaching assignments or allowed her to engage in other faculty duties indefinitely.

2

## B. CASPER SUES AND THE TRIAL COURT GRANTS PLEA TO JURISDICTION

Initially, Casper sued only TWU, alleging that she was not afforded her entitled state and federal due process rights before being placed on leave or having her teaching and faculty duties curbed. TWU answered and filed its initial Plea to the Jurisdiction that challenged the face of Casper's pleadings and argued that TWU was entitled to sovereign immunity. Casper then filed her First Amended Petition, which added the Individual Administrators[1] and also added a claim that TWU and the Individual Administrators had violated her First Amendment rights. She requested only declaratory relief, injunctive relief, and attorney's fees.

TWU and the Individual Administrators then filed their Supplemental Plea to the Jurisdiction, which effectively joined the Individual Administrators to TWU's original plea in arguing that Casper's pleadings were facially invalid and, thus, barred by sovereign immunity. Specifically, Appellees contended that Casper had not pleaded protectable property, liberty, or speech interests and that she had received all process due to her. They also argued that Casper's federal claims should be dismissed because the *Ex Parte Young* doctrine did not apply to allow for those claims to be brought in state court against the Individual Administrators in their official capacities.

---

[1]The Individual Administrators are Abigail Tilton (dean of the college of arts and sciences); Shannon Scott (associate dean); Genevieve West (department chair); Symone Osieko (director of civility and community standards and Title IX coordinator); Carine Feyten (chancellor and president); Caryolyn Kapinus (provost and executive vice president for academic affairs); and Katherine Antwi Green (general counsel, board secretary, and chief operating officer).

Casper then moved for a continuance so that she could "adequately respond to" Appellees' plea and requested that Appellees be ordered to engage in limited discovery to aid in her response to their jurisdictional plea.[2] Without ruling on Casper's continuance motion, the trial court granted the Plea to the Jurisdiction as to both TWU and the Individual Administrators and dismissed Casper's claims with prejudice. The trial court did not state the basis on which it granted the plea. Casper requested findings of fact and conclusions of law and filed motions for new trial and to reinstate. The trial court denied the request for findings of fact and conclusions of law and both motions. Casper appealed.[3]

## C. CASPER'S FIRST AMENDED PETITION

Casper's First Amended Petition (Petition)—the pleading that was live when the trial court decided the Plea to the Jurisdiction—alleged that TWU and each of the Individual Administrators violated her rights under the due course clause of the Texas Constitution and, via 42 U.S.C. § 1983, her federal due process and First Amendment

---

[2]Twice before, Casper had moved for an order to compel Appellees to respond to her propounded discovery requests but never secured a ruling on those motions.

[3]On appeal, Casper does not challenge the dismissal of TWU as a defendant and asks only that we consider whether the trial court erred in granting the plea to the jurisdiction as to the Individual Administrators.

rights. What follows is a summary of the facts pleaded by Casper in her Petition that are relevant to the jurisdictional analysis.[4]

Casper began teaching undergraduate and graduate English courses at TWU in 1969, and she earned tenure in 1978. Beyond teaching, Casper has been professionally published, engaged in research, served on "numerous" TWU committees, acted as faculty advisor for student organizations, and has won various teaching awards.

During the 2020 fall semester, Casper taught a small grammar and composition course via Zoom. At the conclusion of the course, one of the students—who had failed the course—filed a complaint against Casper. The student alleged that Casper had been "biased" against her due to her race, had routinely demeaned and embarrassed her in front of her classmates,[5] and had failed to offer her the required disability accommodations for her dyslexia.

---

[4]Casper attached and referred to a number of documents in her Petition, including: a copy of the student's completed complaint form; a February 26, 2021 letter from Tilton to Casper; two letters (dated July 7, 2021, and October 4, 2021) from Osieko to Casper; and a declaration from Casper's attorney outlining various communications he had with TWU. *See City of Abilene v. Carter*, 530 S.W.3d 268, 277 (Tex. App.—Eastland 2017, no pet.) ("[E]xhibits attached to and referred to in pleadings may be considered when determining whether the plaintiff has stated a cause of action.").

[5]For example, the student alleged that on one occasion Casper had told the student's class that it was "the least educated group that [Casper] had ever taught" and that their writing "indicated [their] intelligence, and if someone read [their] papers, they would look down on [them]."

In a February 26, 2021 letter from dean Abigail Tilton with the subject heading "Leave Pending an Investigation," Casper was notified of the student complaint and the pending investigation. Tilton informed Casper that she was placed on leave with pay "through the completion of the investigation"—an action that Tilton characterized as "administrative in nature." Casper was told that, while she was on leave, she could not "participate in any activities or be on any TWU property in [her] role as a faculty member, including communicating or meeting with students, faculty, or staff" or "communicate with students, faculty, or staff, including on social media, about the investigation or any other official [TWU] business." If Casper needed "to communicate with someone for official reasons," Tilton directed her to ask Tilton to coordinate such communication.

Tilton also informed Casper that she would continue to have access to her TWU email account to "perform [her] individual activities." Additionally, Tilton stated, "[W]hile I cannot direct you not to discuss the investigation, I hope you will treat this as the sensitive matter it is." According to Tilton, "[m]embers of the [TWU] community" would be informed of Casper's leave "on an as-needed basis." Tilton said that Casper would be notified when the investigation concluded and that "failure to follow any of these directives [would be] good cause for disciplinary action, including termination of [Casper's] employment."

On March 11, 2021, Casper met with Osieko, who explained to Casper the allegations contained in the student's complaint. At this meeting Osieko did not ask

6

Casper "a single investigatory question" or give her an opportunity to present any evidence to dispute the complaint. But Casper was subsequently given a copy of the complaint, and shortly after the meeting, she provided written documentation and emails to refute the allegations. On May 7, 2021—upon hearing nothing further from TWU about the investigation—Casper filed a grievance with TWU's general counsel that alleged various due process violations and failures to comply with TWU policies and procedures related to her leave.

Casper then received a July 7, 2021 letter from Osieko. This letter—entitled "Investigation Outcome"—informed Casper that the investigation had led to the conclusion that the evidence sufficiently substantiated the student's allegations of disability discrimination and demeaning conduct toward students, in violation of three specifically delineated TWU policies. However, the evidence did not substantiate the allegations of racial discrimination. Osieko stated that the investigation consisted of interviewing Casper and various other school administrators as well as reviewing "several emails and other documents." Osieko conveyed that "[t]his concludes [the] investigation of all claims and allegations in this matter." Casper denies that she was ever interviewed as part of the investigation.

On July 19, 2021, Casper's attorney spoke with Green who informed him that, according to sources from the "highest levels" of TWU, Casper would never be allowed to teach at TWU again.[6]

Then, on October 4, 2021, Casper received another Investigation Outcome letter from Osieko. This letter drew the same basic conclusions regarding the student complaint but added for the first time that the investigation had uncovered documented, "[a]mple evidence, extending back 11 years," that raised "great concern for Dr. Casper's interaction with students during her career at" TWU. This included evidence showing that Casper had "denied or resisted to provide approved disability accommodations for student(s)[;] . . . resisted to adapt to the use of various technologies or teaching methods even if these changes were for the benefit of the students; and often used insensitive, unprofessional, dismissive and/or demeaning language when communicating with students."

To the contrary, Casper alleged that she had worked diligently to ensure that the complaining student's accommodations were met and had encouraged the student not to give up on the course after the student emailed that she was struggling and overwhelmed by the course. Still, the student continued to struggle, stopped attending class sessions, and failed to take the final exam—which led to her failing the course.

_____

[6]Casper also alleged that Appellees "have maintained that Casper remains under their 'watchful eye,'" but she did not attribute this quote to any particular person.

Casper alleged that there "has never been another such complaint filed against [her]" during her time at TWU and that she was not provided with any specific evidence to substantiate the new allegations asserted in the October 4 letter that purportedly extend back eleven years: "[t]o this day, Casper has no clue why she was found to have allegedly violated a TWU policy and why she was removed from the classroom." Hoping to obtain such evidence, she met with Feyten, Kapinus, and Green—to no avail.

And Casper further made requests with Tilton, Scott, and West to return to the classroom. But, since she was put on leave in February 2021, Casper has been prohibited from teaching or "having any role" at TWU. This is despite the fact that she received an overall rating of "Effective" on a performance review in the spring of 2022 and a merit award in January 2022 "on the basis of [her] performance" and in "recognition of [her] valuable performance contribution."

Casper asserted due course and due process violations pursuant to the Texas and U.S. Constitutions, alleging that she had been deprived of property and liberty interests because she had not been permitted to "teach or engage with students" since February 2021, despite not being given the proper notice and opportunity to be heard. She further alleged that TWU had imposed a stigma on her that "foreclosed her freedom to take advantage of employment opportunities."

Casper's First Amendment claim, brought via 42 U.S.C. § 1983, appears to allege five specific violations:

9

- Being "stripped of her opportunity to teach";

- Being instructed not to come to TWU's campus;

- Being instructed not to "talk to or communicate with anyone associated with" TWU;

- Being denied the opportunity "to grieve the dispute at issue"; and

- Being denied the opportunity to "speak and challenge the findings set forth" in both of the Investigation Outcome letters.

Casper alleged that the Individual Administrators were not entitled to sovereign immunity as to any of these claims because they "acted without legal authority or failed to perform ministerial acts" in violation of both the Texas and U.S. Constitutions. She pleaded requests for declaratory and injunctive relief related to her purported rights and also sought reimbursement of her attorney's fees pursuant to Texas and federal statutes. She made no claim for monetary damages.

## II. STANDARD OF REVIEW AND ULTRA VIRES SUITS

As a state educational institution, TWU and its officers acting in their official capacities generally have sovereign immunity from suit. Tex. Educ. Code Ann. §§ 61.003(2)–(3), 107.101 (establishing TWU as a state university); *see Tex. S. Univ. v. Villareal*, 620 S.W.3d 899, 904 (Tex. 2021). Sovereign immunity defeats a trial court's subject matter jurisdiction and is thus properly asserted in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A trial court must determine at its earliest opportunity whether it has jurisdiction to decide

the case before allowing it to proceed. *Id.* "Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed de novo." *Id.* When, as here, a plea to the jurisdiction challenges only the pleadings, we determine if the plaintiff alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Id.* We construe the pleadings liberally in favor of the plaintiff and look to her intent. *Id.* "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court[']s jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff[] should be afforded the opportunity to amend." *Id.* at 226–27. If, however, the pleadings affirmatively negate jurisdiction, then a plea to the jurisdiction may be granted without allowing an opportunity to amend. *Id.* at 227.

Although sovereign immunity generally bars suits against state officers in their official capacities, the law allows for ultra vires suits that seek prospective, injunctive relief—rather than monetary damages—against those officers. *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021). To successfully assert an ultra vires claim, a plaintiff must plead, and ultimately prove, that the state officer acted without legal authority or failed to perform a ministerial act. *Id.* An officer acts without legal authority "if he exceeds the bounds of his granted authority or his acts conflict with the law itself." *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016).

Thus, "to defeat a plea to the jurisdiction, the plaintiff suing the state or its officers must plead facts that, if true, 'affirmatively demonstrate' that sovereign

11

immunity either does not apply or has been waived." *Matzen*, 659 S.W.3d at 388 (quoting *Miranda*, 133 S.W.3d at 226). "As applied to ultra vires claims, this rule requires the plaintiff's petition to allege facts affirmatively demonstrating actionable ultra vires conduct by state officials in order to avoid dismissal on jurisdictional grounds due to sovereign immunity." *Id.* Stated differently, if additional facts are needed—beyond what the plaintiff has pleaded—to support the ultra vires claim, "then the plaintiff has not affirmatively demonstrated the court's jurisdiction" and a plea to the jurisdiction should be granted. *Id.* at 389.

## III. DISCUSSION

Casper complains that the trial court erred because (1) the Individual Administrators did not have immunity from her claims, (2) she properly pleaded her due process claims, (3) she properly pleaded her First Amendment claims, and (4) it did not allow for limited, jurisdictional discovery before granting the plea to the jurisdiction.

### A. ISSUE ONE DOES NOT STAND ALONE

In her first issue, Casper argues that the Individual Administrators are not immune to her suit because she sued them for prospective, injunctive relief rather than for money damages. Casper's baseline assertion is correct: she could bring an ultra vires suit against the Individual Administrators for prospective, injunctive relief. But our immunity discussion does not end there. To defeat immunity, she must have also pleaded sufficient facts to support her ultra vires claims. *See id.* Thus, though

12

Casper couches her first issue as one separate from the rest, it inherently collapses into issues two and three because the Individual Administrators' immunity is tied to whether she affirmatively pleaded facts to support both her due process and First Amendment claims against them.[7] We must, then, consider their immunity in relation to the facts pleaded as to each claim.

### B. ISSUE TWO: DUE PROCESS AND DUE COURSE CLAIMS[8]

In her second issue, Casper contends that the trial court erred in granting Appellees' Plea to the Jurisdiction because she sufficiently pleaded her due process claims. According to Casper, she pleaded that the Individual Administrators' actions deprived her of her (1) property interests by "coercing her to retire through a permanent suspension" and prohibiting her from teaching and performing other

---

[7]Appellees argue that Casper's federal due process and First Amendment claims should be dismissed outright. Their argument contends that, because the *Ex parte Young* doctrine does not apply here, they are immune from federal law claims asserted in a Texas court. *See* 209 U.S. 123, 156, 128 S. Ct. 441, 452 (1908). Because we affirm the trial court's judgment on other grounds, we do not directly address this argument. *See Doe v. City of Fort Worth*, 646 S.W.3d 889, 896 n.4 (Tex. App.—Fort Worth 2022, no pet.) (explaining that, when trial court does not state the basis of its order granting a plea to the jurisdiction, appellate court may affirm on any basis preserved in the record).

[8]Casper alleged due process claims under the U.S. Constitution and due course claims under the Texas Constitution. *See* U.S. CONST. amend. XIV, § 1; Tex. Const. art. I, § 19. Texas courts "generally construe the due course clause in the same way as its federal counterpart," *Tex. Workers' Comp. Comm'n v. Patient Advocs. of Tex.*, 136 S.W.3d 643, 658 (Tex. 2004), and treat issues citing both provisions as a single claim, *Matzen*, 659 S.W.3d at 389 n.8. In doing so, we may look to both federal and Texas case law in making due process determinations. *Id.* at 658; *Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019).

faculty duties and (2) liberty interests "by stigmatizing her and coercing her to quit."

Appellees counter that Casper's claims are facially invalid because these are not

recognized property or liberty interests that entitle her to due process protection. We

agree with Appellees.

## 1. Due Process

The U.S. and Texas Constitutions prohibit the state from depriving its citizens

of life, liberty, or property without due process. U.S. CONST. amend. XIV, § 1; Tex.

Const. art. I, § 19. A two-part test governs due process claims: it must be determined

(1) if the plaintiff had a liberty or property interest that was entitled to procedural due

process protection and (2) if so, what process was due. *Mosley*, 593 S.W.3d at 264.

### a. Property interests

We start with Casper's contention that she was deprived of a property interest

without due process.

### 1. Relevant law

A tenured professor has a property interest in continued employment and the

economic fruits of that employment.[9] *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564,

577, 92 S. Ct. 2701, 2709 (1972). But to have a protected property interest in other,

noneconomic benefits, a plaintiff must clearly have more than an abstract need,

---

[9]The parties do not dispute that Casper's tenure entitled her to due process related to her continued employment, salary, and other economic benefits, and there is no question that she retained each.

14

desire, or even unilateral expectation of it. *Id.* She must instead "have a legitimate claim of entitlement to it." *Id.*; *Honors Academ., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018); *see Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 754 n.3 (5th Cir. 1986), *aff'd in part, remanded in part on other grounds*, 491 U.S. 701, 109 S. Ct. 2702 ("When a public employee has a legitimate entitlement to his employment, the due process clause may protect as 'property' no more than the status of being an employee of the governmental employer in question together with the economic fruits that accompany the position. Although the governmental employer may specifically create a property interest in a noneconomic benefit—such as a particular work assignment—a property interest in employment generally does not create due process property protection for such benefit."). This is because property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law" or contract. *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709; *see DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009), *abrogated on other grounds as recognized*, 894 F.3d 632, 640 (5th Cir. 2018). Put differently, because the Constitution does not create or define property interests, none exist unless created by an independent source. *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709; *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 577 (6th Cir. 2021).

Accordingly, courts in Texas and across the nation have repeatedly held that, unless attendant to an independent statutory or contractual source, no property rights

exist to protect specific duties of employment.[10]  Nor are property rights implicated

simply because a public employee is suspended, reassigned, or placed on leave.[11]

*Lollar v. Baker*, 196 F.3d 603, 608 (5th Cir. 1999).  Specific to tenured or contract

professors and teachers, courts overwhelmingly agree that there is no property interest

---

[10]*See, e.g.*, *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 9 (1st Cir. 2003) ("Plaintiff's supervisory duties [as a federal police officer] alone do not qualify as such a protected interest—even if we assume, despite indications to the contrary in her own sworn statement, that they were eliminated permanently."); *Harris v. Bd. of Educ. of City of Atlanta*, 105 F.3d 591, 597 (11th Cir. 1997) (superintendent who was relieved of his duties but received full pay and benefits was not denied any property interest); *Swick v. City of Chi.*, 11 F.3d 85, 87 (7th Cir. 1993) ("We do not think that 'property' within the sense of the [Fourteenth Amendment] should be extended to the purely dignitary or otherwise nonpecuniary dimensions of employment."); *Quives v. Campbell*, 934 F.2d 668, 670–71 (5th Cir. 1991) (no property interest to specific job assignment where employee was reinstated to another position with the same pay and benefits); *Kelleher v. Flawn*, 761 F.2d 1079, 1087 (5th Cir. 1985); *Royster v. Bd of Trs. of Anderson Cnty. Sch. Dist.*, 774 F.2d 618, 621 (4th Cir. 1985) (superintendent had no property right to non-economic benefits of position); *Richards v. City of Weatherford*, 145 F. Supp. 2d 786, 790–91 (N.D. Tex. 2001) (citing a "plethora of decisions" across federal circuit courts "holding that a property interest does not arise from a public employee's suspension, reassignment, placement on leave, or the mere duties or responsibilities of a position of employment"); *Hill v. Silsbee Indep. Sch. Dist.*, 933 F. Supp. 616, 625 (E.D. Tex. 1996) (no property interest for reassigned coach in his coaching duties); *In re Amos*, 397 S.W.3d 309, 316 (Tex. App.—Dallas 2013, no pet.) (no property interest for Texas judge to preside over particular case).

[11]*See, e.g.*, *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) (no property interest implicated when plaintiff was suspended with pay); *Schultea v. Wood*, 27 F.3d 1112, 1117 (5th Cir. 1994) (no property interest when chief of police was reassigned but did not suffer salary decrease); *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990) ("[T]he constitutionally protected interest in employment does not extend to the right to possess and retain a particular job or to perform particular services.").

16

in specific teaching assignments or other faculty duties.[12] *Fass v. Benson*, No. 05-21-00799-CV, 2023 WL 3860441, at \*6 (Tex. App.—Dallas June 7, 2023, no pet. h.) (mem. op.).

### 2. Casper did not plead a protectable property interest

Thus, Casper needed to plead the existence of property rights that derived from some independent source. *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709. She contends on appeal that, in an attempt to force her to quit or retire,[13] Appellees

---

[12] *See, e.g., Kelleher*, 761 F.2d at 1086–87, (holding that graduate teaching instructor had no property right to specific teaching assignment and that no property interests were implicated when she was reassigned from lecture to nonlecture duties); *Depree*, 588 F.3d at 289 (holding that tenured business professor who retained his tenure, salary, and title had no property right in teaching or having access to the business school); *O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005) ("[N]o court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties."); *Kruger v. Cressy*, 201 F.3d 427, \*1 (1st Cir. 2001) (no property right in being department chair); *Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 453 (S.D.N.Y. 2010) ("An employee who continues to be paid cannot sustain a claim for deprivation of property without due process even if relieved from job duties.") (internal quotations omitted); *Ishoo v. Bd. of Regents Univ. of N.M.*, No. CV-06-0747 MV/ACT, 2007 WL 9729216, at \*15 (D.N.M. Sept. 29, 2007) ("Plaintiff's argument that his paid administrative leave implicates due process because he was not permitted to perform the functions of his job is soundly rejected by the Supreme Court and Tenth Circuit . . . .") (collecting cases); *Wagner v. Tex. A & M Univ.*, 939 F. Supp. 1297, 1312 (S.D. Tex. 1996) ("Work responsibilities that are uncompensated do not create protectible property interests . . . ."); *McCartney v. May*, 50 S.W.3d 599, 609 (Tex. App.—Amarillo 2001, no pet.) ("[A]bsent a contractual provision limiting the employer, an instructor has no property right in a particular teaching assignment, or in teaching classes at all.").

[13] To the extent that Casper argues that she raised a claim for constructive discharge or forced retirement, we overrule this argument because she did not resign her position or retire. *See Green v. Brennan*, 578 U.S. 547, 555, 136 S. Ct. 1769, 1777 (2016) (holding that, to sustain a constructive discharge claim, a plaintiff must show

denied her the right to teach, participate in supervising student organizations, and "engage in any other on-campus activity in which she typically participated." Conceding that a temporary suspension may not have affected a property interest, Casper instead takes issue with the indefinite and prolonged nature of these prohibitions.

The problem is that Casper did not plead or otherwise show that any of the rights to which she feels entitled are grounded in an independent source—no matter the length of their alleged deprivation. She alludes to two possible sources: TWU "policies and procedures" and Texas Education Code Section 51.922. But Casper cites no specific TWU policies or procedures from which these rights may have derived, and even if she had, we know that a state employer's failure to follow its own governing rules cannot create a property interest that does not otherwise exist. *See Fass*, 2023 WL 3860441, at *7. As for Section 51.922 of the Education Code, it is irrelevant to the conversation—it merely provides that a higher education institution "may not impose a mandatory retirement age for tenured faculty." Tex. Educ. Code Ann. § 51.922(b). There is no indication in the record that Appellees attempted to impose a mandatory retirement age on its tenured faculty.

---

"that he actually resigned"); *see also Lara v. Unified Sch. Dist. #501, Shawnee Cnty. Kan.,* No. 06-4145-RDR, 2008 WL 11378802, at *2 (D. Kan. Oct. 16, 2008) (explaining and collecting cases showing that "[c]ases alleging discrimination in employment based upon an allegation of forced retirement have uniformly been considered under the constructive discharge doctrine").

Neither does Casper cite any compelling precedent to support her position. She cites a single opinion—from a federal district court in Pennsylvania—which she contends stands for the proposition that a suspension with pay implicates a public employee's property interests. *See Baker v. Moon Area Sch. Dist.*, No. CV 15-1674, 2018 WL 4057179, at \*2 (W.D. Pa. Aug. 27, 2018). In *Baker*, a public-school superintendent was first suspended with pay, then suspended without pay, and finally terminated from his employment altogether. *Id.* at \*2. To determine whether the superintendent's property interests in his employment were violated when he was placed on paid suspension without due process, the district court was tasked with making a narrow determination: whether "sources of state law reveal that a superintendent's paid suspension is treated as a deprivation of a state-created right." *Id.* The district court noted that the superintendent's contract and Pennsylvania law prohibited him from being terminated without cause and also limited a school board's power to enforce paid suspensions against school officials. *Id.* Based on these independent sources, the district court found "that Pennsylvania treats a superintendent's right to continued employment without suspension (even paid suspension) as a property right." *Id.*

*Baker* is not helpful to Casper's cause for the reason we already explained: she did not affirmatively show, as did the superintendent in *Baker*, that she was deprived of a protectable property right grounded in an independent source. Ultimately, the

19

circumstances in *Baker* are so narrowly tailored to Pennsylvania public-school superintendents as to be nearly meaningless for our purposes.

In the absence of an independent source creating the property rights alleged by Casper and in the face of precedent so overwhelmingly contrary to her position, we hold that Casper failed to plead facts affirmatively demonstrating that she had an actionable property-interest due process claim.[14] *See Matzen*, 659 S.W.3d at 388.

### b. Liberty interests

We next move to the question of whether Casper's liberty interests were violated without due process.

### 1. Relevant law

"A public employer may unconstitutionally deprive its employee of a liberty interest if it discharges him under stigmatizing circumstances without giving the employee an opportunity to clear his name." *Caleb v. Carranza*, 518 S.W.3d 537, 545 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Arrington v. Cty. of Dall.*, 970 F.2d 1441, 1447 (5th Cir. 1992)). Claims of the sort brought in this case—

---

[14]On this issue, the parties also lodge competing interpretations of one sentence from the Supreme Court's opinion in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544–45, 105 S. Ct. 1487, 1495 (1985) (stating that "in those situations where the employer perceives a significant hazard in keeping the employees on the job, it can avoid the problem by suspending with pay"). We will not wade into the *Loudermill* discussion because the relevant statement appears to be dicta, *see Bailey v. Bd. of Cnt'y Com'rs of Alachua Cnt'y, Fla.*, 956 F.2d 1112, 1124 n.13 (11th Cir. 1992), and because, even in *Loudermill's* absence, the wealth of relevant precedent is sufficient to support our holding.

sometimes referred to as "stigma-plus" claims—require a plaintiff to demonstrate that the state imposed a stigma connected to its denial of a right or status previously recognized by state law. *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th Cir. 1984); *see Rickert v. Meade*, No. 06-20-00002-CV, 2020 WL 4354946, at *2 (Tex. App.—Texarkana July 30, 2020, no pet.) (mem. op.).

"[T]he process due such an individual is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee." *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000) (internal citation and quotation omitted). "A party does not have a liberty interest in [her] reputation . . . unless [s]he can establish that the governmental employer's charges against [her] rise to such a level that they create a 'badge of infamy' which destroys the claimant's ability to take advantage of other employment opportunities." *Evans v. City of Dall.*, 861 F.2d 846, 851 (5th Cir. 1988); *see Hughes*, 204 F.3d at 226; *Phelan v. Tex. Tech Univ.*, No. 07-07-0171-CV, 2008 WL 190741, at *10 (Tex. App.— Amarillo Jan. 23, 2008, pet. denied) (mem. op.) ("[A] liberty interest is affected only when a plaintiff is terminated for reasons which were false, stigmatizing, and published, such that his standing in the community is seriously damaged or stigmatized to the extent he cannot seek or obtain other employment."). The plaintiff must also show that her employer "has made or is likely to make the . . . stigmatizing charges public in any official or intentional manner, other than in connection with the defense of [related legal] action." *Wells*, 736 F.2d at 256 (internal quotations omitted);

21

*see Bishop v. Wood*, 426 U.S. 341, 348, 96 S. Ct. 2074, 2079 (1976) (holding that city manager's asserted reasons for firing police officer "cannot properly form the basis" of police officer's liberty-interest due process claim because those reasons were never made public); *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) ("The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest."); *Villarreal*, 620 S.W.3d at 907 (citing *Bishop*, 426 U.S. at 348–49, 96 S. Ct. at 2079, and holding that student dismissed for poor academic performance failed to plead liberty-interest due process claim in part because he did not allege that the school had publicly disclosed its reasons underlying his dismissal).

Thus, to plead the deprivation of a liberty interest without due process, a plaintiff must allege (1) that she was a public employee, (2) that she was discharged,[15] (3) that stigmatizing charges were made against her in connection with her discharge,

---

[15]Though courts have routinely held that the retention of employment negates outright a liberty-deprivation claim, *see, e.g.*, *Schultea v. Wood*, 27 F.3d 1112, 1117 (5th Cir. 1994), the Fifth Circuit has suggested that an adverse employment action may implicate a liberty interest if "it constitutes such a change of status as to be regarded essentially as a loss of employment." *Moore v. Otero*, 557 F.2d 435, 438 (5th Cir. 1977) (holding that police officer who was transferred from a supervisory role to patrolman was not deprived of a liberty interest and that "his retention of employment negate[d] his claim" but explaining that if his transfer, for example, had been to a janitorial position, the loss of status may have given rise to a liberty interest); *but see Daly v. Sprague*, 675 F.2d 716, 728 (5th Cir. 1982) (holding that tenured medical-school professor who had suffered loss of clinical privileges was not denied a liberty interest because he retained his tenured professorship and made no showing that he was entitled to clinical privileges).

22

(4) that the charges were false, (5) that the charges were made public, (6) that she requested a name-clearing hearing, and (7) that the hearing was denied. *Hughes*, 204 F.3d at 226; *see Town of Shady Shores v. Swanson*, 544 S.W.3d 426, 441 (Tex. App.—Fort Worth 2018), *rev'd in part on other grounds*, 590 S.W.3d 544, 553 (Tex. 2019).

### 2. Casper did not plead that the charges against her were made public nor did she plead a proper stigma-plus claim

Casper argues that the Individual Administrators deprived her of a liberty interest "by stigmatizing her and coercing her to quit." Namely, she claims stigma based on Appellees' "false allegations" that she failed to provide disability accommodations to students, did not adapt to beneficial technologies and teaching methods, and demeaned students. According to Casper, these claims and her subsequent suspension "attached a stigma" to her which will preclude any future university from hiring her. Appellees counter that Casper failed to allege a protected liberty interest because, among other reasons, the Individual Administrators made no public disclosures related to her situation and because she retained her tenured position. We agree with Appellees.

Casper failed to plead that the Individual Administrators publicly disclosed the allegations made against her. Instead, Casper pleaded only that these allegations and her placement on leave were privately discussed between the Individual Administrators and her at either in-person meetings or through various letters. The closest that Casper came to pleading a public disclosure is found in Tilton's February

26, 2021 letter—attached to the Petition—in which Tilton informed Casper that members of the TWU community would be told of the situation on an "as-needed basis." But Casper did not plead any instances of such disclosure.

This omission alone is fatal to Casper's liberty-interest claim because a person cannot be said to have been stigmatized or her reputation constitutionally harmed absent facts that the public was made aware of those allegations or any related negative employment action. *See Bishop*, 426 U.S. at 348, 96 S. Ct. at 2079 ("Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired." (internal citation omitted)).

Further, while an employment action short of discharge may implicate a liberty interest if it is "so devastating as to amount to a loss of employment," such devastation is not exhibited when the plaintiff retains the same position and has not shown that her employer infringed some other right or status previously recognized by state law. *See Daly*, 675 F.2d at 727–28 (internal quotes omitted). Though Casper admits that her status as a tenured professor and its related economic benefits have not changed, she argues that Appellees' actions have so stigmatized her as to be "akin to a discharge." She posits that the deprivations of teaching and faculty duties are "more than enough" to meet the "plus" element of the "stigma-plus" test. But Casper overlooks that the "plus" element required her to plead that she was entitled to teaching and faculty duties under state law—something she has not done. *See id.*

("Under this 'stigma-plus' test ... assuming that the loss of clinical privileges stigmatized [the tenured medical-school professor], his retention of his tenured professorship absent any showing that he had an entitlement to the clinical privileges negates his claim that he was denied 'liberty.'").

Casper also argues that the Texas Constitution's due course clause "provides yet greater protection" than its federal counterpart by permitting liberty-interest claims based only on harm to one's reputation, thus obviating the need for a "stigma-plus" analysis. She purports that Texas courts have not barred reputational due-process claims, and, referring to *NCAA v. Yeo*, 171 S.W.3d 863, 867 (Tex. 2005), intimates that there are material differences between the Texas and U.S. Constitutions that would allow for such claims under the Texas Constitution. According to Casper, because Texas courts have "shown a particular concern for protecting a citizen's ability to choose a career without government stigmatization," reputational stigma alone under the Texas Constitution could "constitute a protected liberty interest."

In *Yeo*, a college athlete claimed that her school infringed on her liberty interests under the Texas due course clause in her reputation as a highly decorated swimmer when it disqualified her from a swimming competition. *Id.* at 865. She effectively argued that the weight of her reputation gave rise to a liberty interest where one may not have existed for a swimmer with lesser qualifications. *Id.* at 868. The Texas Supreme Court disagreed, holding that "whether an interest is protected by due process depends not on its *weight* but on its *nature*." *Id.* at 869 (emphasis in original).

25

It concluded that "the nature of one's interest in a good reputation is the same no matter how good the reputation is" and held that the student had not asserted a protectable liberty interest. *Id.* at 870.

Thus, not only does *Yeo* not stand for the proposition that Texas courts recognize a standalone liberty interest in one's reputation, it strongly suggests to the contrary—that one's reputation alone is not within the nature of liberty interests protected under the due course clause. *See id.* Neither does it stand for the proposition that there is a material difference between the Texas and U.S. Constitutions so as to permit a state claim for reputational injury—no such argument was raised or discussed in *Yeo.* Relatedly, though Casper claims that the Texas and U.S. Constitutions are materially different on this issue, she makes no attempt to show exactly how they are different. Instead, she argues that "[o]ther states have recognized that their constitutions' due process clauses protect reputational interests alone," citing cases from New Hampshire and Pennsylvania. *See State v. Veale*, 972 A.2d 1009, 1014 (N.H. 2009); *In re J.B.*, 107 A.3d 1, 16 (Pa. 2014). We overrule this argument.[16]

---

[16]Casper also likely waived this argument because it raises a new issue for the first time on appeal; she argued in the trial court that the Texas due course and U.S. due process clauses are "virtually identical" and should follow similar interpretations. *See Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014).

For these reasons, we hold that Casper failed to plead facts affirmatively demonstrating that she had an actionable liberty-interest due process claim. We overrule Casper's second issue.

## C. ISSUE THREE: FIRST AMENDMENT CLAIMS

In her third issue, Casper argues that the trial court erred in granting Appellees' plea to the jurisdiction because she sufficiently pleaded her First Amendment claims. She contends that she pleaded two valid First Amendment violations (1) when Appellees instructed her "not to discuss her investigation with anyone" in her private capacity and (2) when Appellees curbed her academic freedom by punishing her "in her capacity as a university professor" for the content of her classroom instruction related to a discussion of a student's paper "addressing the use of racial epithets and the value of hard work."

Appellees argue that Casper failed to allege how each of the Individual Administrators specifically acted to infringe on her First Amendment rights. They also contend that neither of these violations was adequately pleaded because (1) they both relate to speech within Casper's official capacity as a professor, which is not protected; (2) there was no content-based restriction of Casper's classroom instruction; and (3) she had no protectable right to insult students.

### 1. First Amendment Law

It is axiomatic that teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des*

*Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S. Ct. 733, 736 (1969). But public-school-employee speech rights "are [not] so boundless that they may deliver any message to anyone anytime they wish." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022). "In addition to being private citizens, teachers . . . are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.* "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006).

To deal with the complex interplay between a teacher's speech rights and government employment, the Supreme Court has developed a two-step test to determine if those rights were violated. *Id.*; *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97, 108 S. Ct. 2667, 2677–78 (1988) (explaining that "compelled silence" claims are analyzed the same as other First Amendment claims). First, the nature of the speech must be determined: "If a public employee speaks pursuant to his or her official duties[,] . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy*, 142 S. Ct. at 2423 (internal quotations and punctuation omitted). A court should proceed to the second step—balancing the employee's interests with the state's interests—only if it determines that the employee was not speaking in her official

28

capacity but, rather, as a private citizen on a matter of public concern. *Id.*; *Garcetti*, 547 U.S. at 419, 126 S. Ct. at 1958.

## 2. Prohibition Against Discussing the Investigation

Casper first argues that she adequately pleaded that her First Amendment rights were violated by Tilton's February 26 letter, which prohibited Casper from speaking to anyone at TWU about the investigation into the student's complaint. She says that this prohibition infringed upon her speech as a private citizen, which entitled her to protection under *Kennedy*, 142 S. Ct. at 2423.[17]

### a. This claim applies only to Tilton

First, we note that Casper imputes this purported violation to all Appellees, rather than alleging it against Tilton alone. But the facts as pleaded by Casper establish only that Tilton—by way of her February 26 letter—prohibited Casper from speaking of her leave and the investigation. Accordingly, this claim was not properly asserted against any Appellee apart from Tilton, and we hold that the trial court did not err in dismissing this claim against the other Individual Adminstrators. *See Haverkamp v. Linthicum*, 6 F.4th 662, 671 (5th Cir. 2021) ("[A]bsent any allegations tying [the defendant] to the specific decisions at issue, it cannot be plausibly inferred that [the defendant] played any role in the decisions [the plaintiff] challenges as unconstitutional."). As it relates to Tilton, we overrule this portion of Casper's third

---

[17]Casper does not argue that the protections of academic freedom apply to her alleged right to speak about the investigation.

issue for two reasons: (1) Casper's Petition alleges only that this speech prohibition related to her in her official capacity, not as a private citizen and (2) any remedy for this alleged violation would be impermissibly retrospective in nature.

### b. Only in Casper's official capacity

In *Kennedy*, a high-school football coach argued that the school district violated his free speech rights when he was terminated for praying at midfield after games. 142 S. Ct. at 2415. The Supreme Court held that the coach's praying was private speech as his prayers did not fall "ordinarily within the scope of his duties as a coach" because he was not speaking pursuant to a government policy or seeking to convey a government-created message. *Id.* (internal quotations omitted). Further, the coach "was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id.* In other words, "[the coach's] prayers did not owe [their] existence" to his duties as a public employee. *Id.*

Casper likens herself to the football coach in *Kennedy*, arguing that Tilton unconstitutionally prohibited her from having private conversations as a private citizen. But her Petition tells a different story. The facts as pleaded do not establish that she was prohibited from speaking as a private citizen at all. Instead, her Petition establishes that Tilton only prohibited Casper—in Casper's "role as a faculty member"—from speaking to "students, faculty or staff . . . about the investigation or any other official [TWU] business." And, though Tilton asked Casper to treat the

30

situation sensitively, Tilton also acknowledged that she could not direct Casper not to speak more broadly about the investigation. In other words, according to Casper's pleaded facts, nothing prohibited her from speaking about any and everything related to her leave and the investigation when speaking as a private citizen. Thus, this argument is not supported by her pleadings.

### c. Only prospective relief available

Additionally, even if we agreed that Casper pleaded a valid claim related to being prohibited from privately speaking about the investigation, that injury would have invariably occurred in the past and is not redressable through an ultra vires suit. As discussed above, "ultra vires claimants are only entitled to prospective relief." *City of Hous. v. Hous. Mun. Empls. Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018). "If the relief is injunctive, then whether it is retrospective or prospective is measured from the date of injunction." *Id.* "If the injury has already occurred and the only plausible remedy is monetary damages, an ultra vires claim will not lie." *Id.*

In Tilton's February 26 letter, she explained that Casper's placement on leave was a temporary administrative action that would end when the investigation was closed. Importantly, Tilton informed Casper that she was only prohibited from speaking about the investigation while she was on the administrative leave. Thus, when Casper was informed in Osieko's July 19 letter that the investigation had concluded, the administrative leave and directive not to speak about the investigation

31

also ended. Casper did not allege any additional or ongoing prohibitions against speaking about the investigation.

The temporary prohibition against speaking about the investigation cannot serve as the basis for Casper's ultra vires suit because any relevant injury has already occurred and any related relief would be retrospective in nature. *Id.*

### 3. Alleged Academic Freedom Violations

Casper also contends that she pleaded two academic freedom violations related to the content of her teaching. First, she argues that she pleaded that Appellees disciplined her based on comments she made during a classroom discussion about a paper written by the complaining student entitled "Racial Slurs and Title VI." Though Casper does not elaborate as to the exact content of these comments, she asserts nonetheless that it is "well-established that speech relating to racial discrimination almost always involves matters of public concern." Second, Casper argues that she pleaded that she was disciplined for statements that she made encouraging the student to "work hard" and to not give up on the class. She contends that these comments "express[ed] a belief that hard work leads to success" which "has become a topic of public controversy and debate" and which represented choices she made concerning classroom discussions and course content.

### a. Academic freedom claims

Though public employees are generally not entitled to First Amendment protections while acting in their official capacities, courts also recognize that academic

32

freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967)). Thus, professors at public universities may retain First Amendment protections to speak about matters of public concern, at least when engaged in core academic functions, such as teaching and scholarship. *See Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021). "However, even this protection has limits, and whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Fass*, 2023 WL 3860441, at *5 (citing *Buchanan*, 919 F.3d at 853). Whether speech involves a matter of public concern is a question of law that asks whether the speech relates to an issue of social, political, or other interest to a community. *Buchanan*, 919 F.3d at 852–53. "The linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Meriwether*, 992 F.3d at 508. On the other hand, no First Amendment protection attaches to speech of a purely private nature, even if the subject matter could conceivably be of public concern under different circumstances. *Bates v. Dallas Indep. Sch. Dist.*, 952 S.W.2d 543, 550 (Tex. App.—Dallas 1997, writ denied) (citing *Connick v. Myers*, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 1691 (1983)).

33

### b. No facts pleaded about any classroom discussions

Casper did not plead any facts related to the "Racial Slurs and Title VI" paper—her Petition contains no reference to any classroom discussions she had with any students. Instead, these facts appear in Casper's response to Appellees' supplemental plea to the jurisdiction. *See Perry v. Devon Energy Corp.*, No. 01-12-00675-CV, 2013 WL 5521963, at *4 (Tex. App.—Houston [1st Dist.] Oct. 3, 2013, no pet.) (mem. op.) ("To determine whether a cause of action has been pleaded, we must be able to ascertain the elements of the cause of action from the pleadings alone.") (citing *Fairdale Ltd. v. Sellers*, 651 S.W.2d 725 (Tex. 1982)).

Casper also seemingly argues on appeal that she was entitled to academic freedom protection related to in-class statements she made about "the value of hard work." But, again, we note that Casper's Petition is wholly devoid of any facts related to this or any other classroom discussion. Instead, Casper only pleaded that the "work hard" comments were made in her private email communications with the complaining student. *See id.*

Because Casper's Petition did not contain facts related to any classroom discussions, we overrule this argument. *See Matzen*, 659 S.W.3d at 389.

### c. Emailed statements not of public concern

Casper pleaded that, in October 2020, the complaining student emailed her to express that she was overwhelmed with the class. Casper responded, encouraging the student to "continue to work hard" and to not give up. Casper argues that these

comments serve as the basis of her academic freedom claim because they speak to an issue of current public debate related to the value of hard work.

In the context of emails between Casper and her student, made solely in response to the student's individual struggles with the class, these comments were of a private nature and not a protectable public concern. *See Bates*, 952 S.W.2d at 550. We recognize that a classroom discussion about the value of hard work might, in another context, conceivably touch upon a public discourse, but those are not the facts that Casper pleaded. *See id.* We overrule this argument.

### d. No facts that Casper's protected speech was censored

Finally, even if Casper had pleaded that she engaged in protectable speech related to a public concern in the classroom, the remainder of her Petition would fail to tie that speech to any unconstitutional ultra vires censorship action by the Individual Administrators. While she does make the conclusory allegation that "[TWU] violated [her] First Amendment rights related to her communications and speech both inside and outside the classroom," even construed liberally, Casper's Petition substantively and repeatedly alleges that she was disciplined based on unfounded complaints that she demeaned students and failed to provide necessary disability accommodations. *See Tex. Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 702 (Tex. App.—Austin 2011, no pet.) ("[M]erely asserting legal conclusions or labeling a defendant's actions as 'ultra vires,' 'illegal,' or 'unconstitutional' does not suffice to plead an ultra vires claim—what matters is whether the *facts* alleged

constitute actions beyond the governmental actor's statutory authority, properly construed.").

Thus, nothing in Casper's Petition—including the documents attached thereto—supports the inference that any Individual Administrator acted with the purpose of censoring the content of her protected speech. *See Fass*, 2023 WL 3860441, at *5 ("Professor Fass has not pleaded any facts indicating [the appellees] censored, or sought to regulate in any way, the content of his quizzes or homework assignments."). And the First Amendment does not shield Casper's speech insofar as it demeans students or denies them their entitled disability accommodations. *See Martin v. Parrish*, 805 F.2d 583, 584–85 (5th Cir. 1986) (holding that professor's profane language and insults directed at his class were not protected). In essence— because her Petition does not include any facts necessary to support an academic freedom claim—Casper seeks to retroactively inject new claims into her ultra vires suit where they did not exist for the trial court to consider them when determining its jurisdiction. *See Matzen*, 659 S.W.3d at 389 (explaining that, to determine ultra vires jurisdiction, "[t]he question is not whether additional, hypothetical facts could come to light that would, in the future, allow [a plaintiff] to state a viable ultra vires claim" but rather whether the plaintiff pleaded facts affirmatively demonstrating its claim).

For these reasons, we hold that Casper failed to "allege facts affirmatively demonstrating actionable ultra vires conduct" related to her First Amendment rights and, therefore, overrule her third issue.[18] *See id.* at 388.

### D. PLEADING DEFECTS NOT CURABLE

Having held that Casper did not sufficiently plead any of her ultra vires claims, we must consider whether the pleading defects can be cured. *See Miranda*, 133 S.W.3d at 226–27. "Appellate courts generally must remand a case to afford parties an opportunity to cure jurisdictional defects in their pleadings when the parties did not have that opportunity in the first instance because the jurisdictional issue arose for the first time on appeal." *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 558–59 (Tex. 2016). However, when a party had an opportunity to amend its pleadings in the trial court after the government filed its plea to the jurisdiction the party is not typically entitled to another opportunity to replead. *Id.* at 559 (citing *Miranda*, 133 S.W.3d at 231).

The jurisdictional issue here did not arise for the first time on appeal. Casper filed her Original Petition and then amended it after Appellees filed their plea to the jurisdiction. Thus, she is "not entitled to another opportunity to replead." *Id.* Regardless, none of the pleading defects here would be curable. As explained above, Casper's due process claims are predicated upon alleged property and liberty interests

---

[18]We also overrule issue one because, as explained above, its resolution inherently depended on our holdings in issues two and three.

that are not legally recognized as protected interests. Her First Amendment claim based on Tilton's prohibition against speaking about the investigation seeks impermissible retrospective relief. And her academic freedom claims are wholly absent from her Petition. *See id.* ("Generally, remand is a mechanism for parties, over whose claims the trial court may have jurisdiction, to plead facts tending to establish that jurisdiction, not for parties, over whose claims the trial court does not have jurisdiction, to plead new claims over which the trial court does have jurisdiction.").

We conclude that Casper is not entitled to another opportunity to amend her Petition.

### E. ISSUE FOUR: JURISDICTIONAL DISCOVERY

In her fourth issue, Casper argues that the trial court erred by failing to grant her motion for continuance and to order Appellees to engage in limited discovery for jurisdictional purposes. Citing *Hearts Bluff Game Ranch, Inc. v. State*, she invites us to reverse the trial court's judgment if we "believe that a fuller record was needed to assess [Appellees'] plea to the jurisdiction." *See* 381 S.W.3d 468, 491 (Tex. 2012). We do not hold that belief.

Under *Hearts Bluff*, Casper was only entitled to targeted discovery if "necessary to illuminate jurisdictional facts." *Id.* (citing *Miranda*, 133 S.W.3d at 233). But when, as here, the plea to the jurisdiction attacks only the sufficiency of the pleadings (thus requiring that all pleaded facts are taken as true), the trial court errs by not ruling on the plea as soon as possible. *See In re Dall. Cnty.*, No. 05-21-01144-CV, 2022 WL

1467987, at *3 (Tex. App.—Dallas May 10, 2022, no pet.) (mem. op.) ("Without any fact-dependent jurisdictional arguments requiring further discovery, the trial court was obligated to hear the pleas to the jurisdiction at the earliest opportunity before considering whether to compel discovery."); *City of Kemah v. Vela*, 149 S.W.3d 199, 205 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (holding trial court erred in denying plea to jurisdiction to allow additional discovery because facts were undisputed and "no additional discovery [was] needed for [appellate court] to conclude that, as a matter of law, sovereign immunity [was] not waived"); *see also City of Galveston v. Gray*, 93 S.W.3d 587, 592 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (holding trial court abused its discretion by failing to rule on city's plea to the jurisdiction and instead granting plaintiff's continuance to conduct jurisdictional discovery).

Beyond this, it appears that Casper waived this argument because, although she asked the trial court on three separate occasions to order discovery from Appellees, we see nothing in the record showing that she obtained a ruling on any of these requests or that she objected to the trial court's failure to rule on her continuance motion. *See* Tex. R. App. P. 33.1(a) (requiring as a prerequisite for presenting a complaint for appellate review that the record show that "the complaint was made to the trial court by a timely request, objection, or motion" and that the trial court made a ruling thereon); *see EnerQuest Oil & Gas, L.L.C. v. Antero Res. Corp.,* No. 02-18-00178-CV, 2019 WL 1583921, at *3 n.6 (Tex. App.—Fort Worth Apr. 11, 2019, pet.

dism'd) (mem. op.) (holding that any error by the trial court in failing to permit jurisdictional discovery was not preserved because record did not show that appellant obtained a ruling on its continuance motion).

For these reasons, we overrule Casper's fourth issue.

## IV. CONCLUSION

Having overruled all of Casper's issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  August 31, 2023